No. 24-1333

# United States Court of Appeals for the Tenth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee*,

v.

**KIMBERLEY ANN TEW,**

*Defendant-Appellant.*

Appeal from the United States District Court for the District of Colorado
No. 1:20-CR-305-DDD-2 — Honorable Daniel D. Domenico, District Judge

# BRIEF OF DEFENDANT-APPELLANT

Justin A. Lollman
GableGotwals
110 N. Elgin Ave., Ste 200
Tulsa, Oklahoma 74120
(918) 595-4800
*jlollman@gablelaw.com*

*Counsel for Appellant*
*Kimberley Ann Tew*

Oral Argument Requested

## TABLE OF CONTENTS


TABLE OF AUTHORITIES....................iii

PRIOR OR RELATED APPEALS....................vi

I. JURISDICTIONAL STATEMENT....................1

II. QUESTIONS PRESENTED....................2

III. STATEMENT OF THE CASE....................2

A. Mrs. Tew's Motion to Suppress....................3

B. Mrs. Tew's First Motion for Severance....................8

C. Mr. Tew's "Abusive Wife" Defense....................9

D. Mrs. Tew's Second Motion for Severance....................14

E. Mr. Tew's "Abusive Wife" Defense Continued....................15

F. Mrs. Tew's Motion for Mistrial and Renewed Motion for Severance....................18

IV. SUMMARY OF THE ARGUMENT....................19

V. ARGUMENT....................22

A. The district court erred in denying Mrs. Tew's motion to Suppress....................23

1. The warrant fails to particularly describe the items to be seized....................22

2. The warrant is facially overbroad, precluding application of the good-faith exception....................28

B. The district court erred in denying Mrs. Tew's midtrial motion for severance based on her husband's mutually antagonistic defense....................33

1. The Tews' defenses were mutually antagonistic ....................22

2. Mr. Tew's antagonistic defense compromised the jury's ability to make a reliable determination about Mrs. Tew's guilty or innocence ....................22

3. The level of extreme prejudice to Mrs. Tew caused by her husband's antagonistic defense required that their cases be severed ....................28

VI. CONCLUSION ....................43

STATEMENT REGARDING ORAL ARGUMENT ....................44

CERTIFICATE OF COMPLIANCE ....................45

CERTIFICATE OF SERVICE ....................45

ATTACHMENTS

1. Judgment in a Criminal Case, August 13, 2024

2. Order Denying Motion to Suppress Evidence, October 27, 2022

3. Excerpts from trial transcript regarding Defendant's motions for severance and for mistrial, February 8, 12, 14, 2024

## TABLE OF AUTHORITIES


*Bruton v. United States*,
391 U.S. 123 (1968) ........ 8

*Cassady v. Goering*,
567 F.3d 628 (10th Cir. 2009) ........ 28, 29, 32, 33

*Fox v. Ward*,
200 F.3d 1286 (10th Cir. 2000) ........ 37

*Groh v. Ramirez*,
540 U.S. 551 (2004) ........ 29, 32

*Maryland v. Garrison*,
480 U.S. 79 (1987) ........ 23

*Mink v. Knox*,
613 F.3d 995 (10th Cir. 2010) ........ 23

*Schaffer v. United States*,
326 U.S. 511 (1960) ........ 34

*United States v. Blunt*,
930 F.3d 119 (3d Cir. 2019) ........ 38, 39, 41, 43

*United States v. Breinig*,
70 F.3d 850 (6th Cir. 1995) ........ 38, 39, 40, 41, 43

*United States v. Burke*,
633 F.3d 984 (10th Cir. 2011) ........ 25

*United States v. Dirden*,
38 F.3d 1131 (10th Cir. 1994) ........ 35, 37

*United States v. Dunn*,
719 F. App'x 746 (10th Cir. 2017) ........ 29, 32

*United States v. Green*,
114 F.4th 163 (3d Cir. 2024) ........ 38, 39, 40, 41, 43

*United States v. George*,
975 F.2d 72 (2d Cir. 1992) ........ 29

*United States v. Herrera*,
444 F.3d 1238 (10th Cir. 2006) ........ 29

*United States v. Jones*,
530 F.3d 1292 (10th Cir. 2008) ........ 36, 37

*United States v. Leary*,
846 F.2d 592 (10th Cir. 1988) ........ 20, 23, 25, 26, 28, 29, 30, 31, 33

*United States v. Loera*,
923 F.3d 907 (10th Cir. 2019) ........ 22

*United States v. Maxwell*,
920 F.2d 1028 (D.C. Cir. 1990) ........ 24, 29

*United States v. Mokbel*,
2021 WL 4554660 (S.D. Tex. Oct. 5, 2021) ........ 24

*United States v. Otero*,
563 F.3d 1127 (10th Cir. 2009) ........ 24, 26, 27

*United States v. Porter*,
745 F.3d 1035 (10th Cir. 2014) ........ 26

*United States v. Pursley*,
474 F.3d 757 (10th Cir. 2007) ........ 34, 35, 37, 42

*United States v. Roche*,
614 F.2d 6 (10th Cir. 1980) ........ 24, 29

*United States v. Romanello*,
726 F.2d 173 (5th Cir. 1984) ........ 35

*United States v. Sadlowski*,
948 F.3d 1200 (10th Cir. 2020) ........ 22

*United States v. Salas*,
106 F.4th 1050 (10th Cir. 2024) ........ 23, 24

*United States v. Stephen*,
984 F.3d 625 (8th Cir. 2021) .......... 26

*United States v. Suggs*,
998 F.3d 1125 (10th Cir. 2021) .......... 23

*United States v. Swan*,
2013 WL 3422022 (D. Me. July 8, 2013) .......... 41

*United States v. Tootick*,
952 F.2d 1078 (9th Cir. 1991) .......... 35, 38

*United States v. Troiano*,
426 F. Supp. 2d 1129 (D. Haw. 2006) .......... 42

*United States v. Warren*,
728 F. App'x 249 (5th Cir. 2018) .......... 34

*United States v. Webster*,
809 F.3d 1158 (10th Cir. 2016) .......... 23

*Voss v. Bergsgaard*,
774 F.2d 402 (10th Cir. 1985) .......... 20, 24, 25, 26, 29, 30, 31, 33

*Zafiro v. United States*,
506 U.S. 534 (1993) .......... 42, 43

## Rules, Statutes, and Constitutional Provisions

Fed. R. Crim. P. 11 .......... 8

Fed. R. Crim. P. 12 .......... 34, 35

Fed. R. Crim. P. 14 .......... 34, 42, 44

18 U.S.C. § 371 .......... 4, 25, 30

18 U.S.C. § 1343 .......... 4, 25

18 U.S.C. § 1349 .......... 4, 25

18 U.S.C. § 1519 .......... 4, 25

18 U.S.C. § 1956 .......... 4, 25
18 U.S.C. § 1957 .......... 4, 25
18 U.S.C. § 3231 .......... 1
22 U.S.C. § 2778 .......... 31
28 U.S.C. § 1291 .......... 1
50 U.S.C. § 2410 .......... 31
U.S. Const. amend. IV. .......... 23

### SECONDARY SOURCES

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) .......... 27
Orin Kerr, *The Digital Fourth Amendment* (2025) .......... 27

## PRIOR OR RELATED APPEALS

Appellant Kimberley Ann Tew has no prior appeals in this case. Mrs. Tew's codefendant, Michael Aaron Tew, has a separate, related appeal pending before this Court at Case No. 24-1465.

# I. JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 18 U.S.C. § 3231. The district court entered judgment on August 13, 2024. R.2 at 61, 1328.[1] Defendant timely appealed on August 20, 2024. R.2 at 62, 1283. This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291.

---

[1] Citations to the record on appeal (10th Cir. ECF #34) take the following form: "R.[volume] at [page]."

Citations to the supplemental record on appeal (10th Cir. ECF #65–67) take the following form: "SR.[volume] at [page]."

## II. QUESTIONS PRESENTED

1. The government searched Kimberley Tew's Apple ID account pursuant to a warrant (i) requiring Apple to produce almost all information associated with the account (including location data, emails, activity logs, iCloud records, and device backups), and (ii) authorizing the government to search for and seize "[a]ll information" within the production over a 2½ year period containing evidence of any violation of one of six broad federal criminal statutes (including conspiracy, wire fraud, attempt, and money laundering). The first question presented is: Did the district court err in denying Mrs. Tew's motion to suppress the search for lack of particularity in the warrant?

2. Kimberley Tew and her husband were jointly tried on charges stemming from an alleged scheme to defraud the husband's former employer. On the third day of trial, the husband's counsel unveiled a new defense strategy, claiming for the first time that Mrs. Tew had controlled and manipulated her husband into committing the alleged fraud. The second question presented is: Did the district court err in denying Mrs. Tew's midtrial motion for severance based on her husband's antagonistic defense?

## III. STATEMENT OF THE CASE

In 2021, Defendant-Appellant Kimberley Ann Tew and her husband, Michael Aaron Tew, were indicted on charges stemming from an alleged scheme to defraud National Air Cargo, a company where Mr. Tew had previously served as chief financial officer. R.1 at 104–10. The Indictment alleged that

Mrs. Tew had conspired with her husband and National's then-controller, Jonathan Yioulos, to submit over $5 million in fraudulent invoices to the company between 2018 and 2020. *Id.*

Mrs. Tew was charged in thirteen of the Indictment's 60 felony counts. Those thirteen counts consisted of—

- one count of conspiracy to commit wire fraud (Count 1),
- seven counts of wire fraud (Counts 16, 21, 22, 25, 26, 31 and 32),
- one count of conspiracy to commit money laundering (Count 41), and
- five counts of money laundering (Counts 43, 44, 47, 48, and 56).

*Id.* at 104–26. Apart from Count 43, Mr. Tew was jointly charged on each of these counts and, in addition, was separately charged with 33 counts of wire fraud, eight counts of money laundering, and four counts of willfully failing to file tax returns—59 counts in total. *Id.*

**A. Mrs. Tew's Motion to Suppress**

During its investigation of the Tews, the government obtained and executed a warrant to search Mrs. Tew's Apple ID account, "*kley@me.com*." R.3 at 195. The government's probable cause for seeking the warrant was all tied to the alleged scheme to steal and launder funds from National Air Cargo. *Id.* at 177–89. The warrant required Apple to turn over almost all information associated with the account, including activity, connection, and transaction logs;

location data; over two years' worth of emails and instant messages; and the "contents of all files and other records stored on iCloud, including all iOS device backups." R.3 at 198–99.

Of the information disclosed, the warrant then authorized the government to search for and seize "[a]ll information" from May 1, 2018, to the date of the warrant (October 1, 2020), constituting "fruits, evidence, and/or instrumentalities of violations" of any one of six "Target Offenses," namely, 18 U.S.C. § 371 (conspiracy), § 1343 (wire fraud), § 1349 (attempt or conspiracy), § 1519 (evidence tampering), § 1956 (money laundering), and § 1957 (transactional money laundering). R.3 at 199. While the warrant offered examples of records and information included within its scope, it did not affirmatively limit the search to those examples, nor did it contain any additional limiting language. *Id.* at 199–200.

The text of the warrant's search and seizure provision is set forth below:

> II. Information to be seized by the government
>
> All information described above in Section I that [is] fruits, evidence and/or instrumentalities of violations of 18 United States Code §§ 371, 1343, 1349, 1519, 1956, and 1957 (the "Target Offenses") since May 1, 2018, including, for each account identifier listed on Attachment A, information pertaining to the following matters:
>
> a. All information, including records, documents, communications, and photographs, regarding violations of the Target Offenses, including information about the planning, motive for, preparation, execution, amendment, concealment, and

> furtherance of a conspiracy or scheme to defraud National Air Cargo, planning, discussion, motive for, execution, amendment, concealment, and furtherance of a conspiracy to commit money laundering or substantive acts of money laundering, whether through fiat currency or cryptocurrency, and about or showing, planning, or concealing the destruction of records or evidence related to the Target Offenses;
>
> b. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);
>
> c. Evidence indicating how and when the account was accessed or used, to determine chronological and geographic context of account access, use and events related to the Target Offenses and the account subscriber;
>
> d. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information) that relate to the Target Offenses;
>
> e. Information about the use and transfer of items of monetary value related to the Target Offenses, such as bank accounts, access of those bank accounts through applications, wire transfers, and cryptocurrency wallets and accounts;
>
> f. Evidence indicating the subscriber's state of mind as it relates to the Target Offenses; and
>
> g. Evidence that may identify any co-coconspirators or aiders and abettors, including records that help reveal their whereabouts.

*Id.*

Before trial, Mrs. Tew moved to suppress the search of her Apple ID account based on the warrant's lack of particularity. She argued the warrant

was "fatally overbroad," describing it as a "general warrant," arguing it allowed the government to search for and seize a "universe" of personal information and communications "regardless of whether [the information sought] was related to the offenses the Government was investigating." R.3 at 111–12.

The government opposed Mrs. Tew's motion. It argued that the warrant was sufficiently particular because it (i) limited law enforcement's search of the account to evidence of violations of one of six Target Offenses, and (ii) was cabined to a 2½ year time frame. R.1 at 374. The government further pointed to fact that the warrant listed "information about … a conspiracy or scheme to defraud National Air Cargo" as an example of the sort of information covered by the warrant, *see* R.3 at 199, claiming (incorrectly) that the example "limited the items to be seized … to a specific scheme against a named victim company." R.1 at 374.

Following a hearing, the court entered an order denying Mrs. Tew's motion. R.1 at 692. It held that the warrant "described the items to be seized with sufficient particularity," noting that it was limited "to evidence related to specific statutes" and "time frames" and further stating (again, incorrectly) that the warrant only allowed for the seizure of "evidence related to … a specific scheme against the named victim company." *Id.* at 698.

At trial, the government relied heavily on evidence obtained from its search of Mrs. Tew's Apple ID account. It introduced approximately 90 exhibits containing information obtained from the account, *see*, *e.g.*, SR.1 at 251–

68, 293, 309, 312, 315, 320, 328, 342, 347, 358, 361–63, 378, 381, 388, 392–93, 400, 414, 418, 421, 445–47, 449–50, 457–60, 462, 1266–67;[2] prominently featured those exhibits in its closing argument, *id.* at 1728–29, 1733, 1736–46, and structured its examination of several key witnesses, including Mr. Yioulos and IRS Special Agent Lisa Palmer, around that evidence. *See*, *e.g.*, *id.* at 251–68, 293–301, 309–10, 312–17, 320–24, 328–42, 347–49, 358–59, 361–64, 378–402, 413–23, 445–63, 1454–55, 1457–65, 1483–90, 1493–95, 1499–1502, 1507–25, 1528–29, 1533–34, 1570–71, 1590–92.

[2] Those exhibits include government exhibit nos. 602 (SR.4 at 7), 605 (*id.* at 8), 613 (SR.16 at 67), 614 (*id.* at 68), 625 (SR.4 at 9), 628 (*id.* at 12), 635 (*id.* at 24), 636 (*id.* at 26), 637 (*id.* at 27), 639 (*id.* at 38), 646 (*id.* at 39), 650 (*id.* at 46), 656 (*id.* at 64), 659 (*id.* at 67), 665 (*id.* at 74), 668 (SR.16 at 143), 669 (SR.4 at 81), 673 (SR.16 at 144), 681 (*id.* at 163), 685 (SR.4 at 83), 689 (SR.17 at 1), 693 (SR.4 at 131), 696 (*id.* at 133), 697 (*id.* at 135), 705 (*id.* at 136), 707 (*id.* at 137), 708 (*id.* at 139), 715 (SR.5 at 1), 717 (*id.* at 20), 718 (*id.* at 21), 730 (SR.17 at 71), 731 (SR.5 at 36), 740 (*id.* at 37), 741 (*id.* at 44), 747 (*id.* at 45), 752 (*id.* at 47), 760 (*id.* at 49), 774 (*id.* at 53), 775 (*id.* at 55), 776 (SR.17 at 114), 784 (*id.* at 129), 786 (SR.5 at 57), 787 (*id.* at 59), 788 (*id.* at 64), 795 (SR.17 at 138), 796 (*id.* at 140), 804 (*id.* at 154), 805 (*id.* at 157), 817 (*id.* at 204), 820 (*id.* at 207), 828 (*id.* at 208), 830 (*id.* at 209), 832 (*id.* at 210), 833 (*id.* at 213), 837 (*id.* at 215), 842 (*id.* at 221), 857 (*id.* at 235), 858 (SR.5 at 79), 863 (SR.17 at 237), 865 (SR.5 at 80), 883 (*id.* at 88), 885 (*id.* at 96), 886 (*id.* at 109), 895 (*id.* at 133), 896 (*id.* at 134), 897 (*id.* at 140), 901 (*id.* at 143), 902 (SR.18 at 1), 915 (*id.* at 7), 917 (SR.6 at 1), 925 (*id.* at 23), 927 (SR.18 at 13), 931 (SR.6 at 30), 932 (*id.* at 33), 934 (*id.* at 41), 937 (*id.* at 46), 938 (*id.* at 47), 941 (*id.* at 53), 942 (*id.* at 69), 946 (*id.* at 74), 958 (*id.* at 88), 960 (*id.* at 94), 964 (*id.* at 97), 966 (*id.* at 102), 967 *(id.* at 106), 970 (*id.* at 114), 989 (SR.18 at 44), 990 (SR.6 at 121).

## B. Mrs. Tew's First Motion for Severance

For the first two years of the case, Mr. and Mrs. Tew were represented by the same counsel. R.1 at 12–40. In June 2022, near the end of their joint representation, Mrs. Tew moved to sever her case from her husband's, arguing that separate trials were warranted (i) under *Bruton*[3] based on statements Mr. Tew had made to the government, incriminating both him and his wife, and (ii) because a joint trial would unfairly prejudice Mrs. Tew based on the mismatch in culpability between her and her husband and the risk that the jury would impermissibly attribute his knowledge and conduct to her based on their status as a married couple. *Id.* at 467–71.

The court denied Mrs. Tew's severance motion. *Id.* at 678. It held that Mr. Tew's prior statements incriminating him and his wife did not trigger *Bruton* concerns because they were all either nontestimonial or, in the case of proffer statements made under Fed. R. Crim. P. 11(f), only admissible if Mr. Tew "opened the door" by presenting a defense at trial inconsistent with such statements, in which case, the government was willing to redact any incriminating statements implicating Mrs. Tew. *Id.* at 680–83. The court further held that neither the disparity in culpability between the Tews nor their status as husband and wife posed a risk of prejudice requiring severance. *Id.* at 683–85.

[3] *Bruton v. United States*, 391 U.S. 123 (1968).

### C. Mr. Tew's "Abusive Wife" Defense

Trial commenced on February 5, 2024, after which it soon became clear that the Tews' defenses were mutually antagonistic. Mrs. Tew's defense focused on *mens rea*, highlighting the lack of evidence tying her as a knowing participant in the conspiracy, which her counsel described as "a scheme concocted and executed by Michael Tew and Jon Yioulos." SR.1 at 182–89, 190. Mr. Tew, meanwhile, pursued what can best be described as a "abusive wife" defense, arguing that Mrs. Tew controlled and manipulated him and Mr. Yioulos into carrying out the fraudulent invoicing scheme. *Id.* at 530–31, 533–34, 536–39, 541–42, 544–47, 884, 1021–22, 1142–44, 1602–03, 1750, 1762–66.

Mr. Tew gave no pretrial notice of his intent to pursue this strategy. *See* R.2 at 733–34 (filing by Mr. Tew stating that "counsel for Mrs. Tew did not have access to the strategy, investigation, or work product of Mr. Tew's attorneys" nor did "they know or have access to Mr. Tew's theory of defense"). Mrs. Tew first became aware of it on the third day of trial, when her husband's attorney cross-examined the government's lead witness, Mr. Yioulos, during which counsel repeatedly elicited testimony painting Mrs. Tew as the "real driver" of the conspiracy and Mr. Tew as her "helpless" victim:

> *Q* Did you talk [with the government] about receiving threats or concerns about extortion from Kimberley?
>
> *A* Yes.
>
> *Q* And did you say to agents, whenever it was a threat, it was from Kimberley?

*A* Yes.

….

*Q* Did you say to agents … [that] *he, Michael was in a bad spot with Kimberley?*

*A* Yes.

*Q* Tell me what you understood *bad spot with Kimberley* to mean?

*A* So, throughout this conspiracy, I believe that behind the scenes, when I say behind the scenes, more the Tew household, I felt that Kimberley was the one—

*MR. KAPLAN:* Your Honor I'm going to object to speculation.

*THE COURT:* No. Overruled. We're discussing his statements. Overruled. Go ahead.

*THE WITNESS:* I felt that Kimberley was the one who was driving the need for funds in the Tew household.

SR.1 at 530–31.

*Q* Is it fair to say, Mr. Yioulos, that Kimberley had an outsized influence on things that happened?

*A* Yes.

*Q* Do you recall telling agents on July 7th, 2020, that quote, *It's almost like this one woman had us both by the balls, and we were kind of—we were both kind of helpless?*

*A* Yes.

*Q* What did you mean?

*A* … I felt like if I tried to do anything, like go to the authorities or anything of that nature, I felt like I was in so deep that I was still going to get myself in trouble, and that behind the scenes the only person who really wanted money to go out still, was Kimberley.

*Id.* at 533–34.

*Q* … Do you recall telling agents that, quote, *Some of the time it's not always, but 50 percent of the time, you could hear his wife Kimberley in the background screaming at him at the top of her lungs?*

*A* Yes.

*Q* Fifty percent of the time you were on the phone with Michael, Ms. Tew was present?

*A* Not—I wouldn't say 50 percent of the time. I would say I think that was a bit of an exaggeration. It was probably closer to—because we would talk often, but when—we would text often, but when we did have phone calls and there was a request for money, especially when I would not send it, I would say that 50 percent of that time, when there was a request for money and I refused or gave some sort of problem, yes, she was in the background.

*Q* And it was those times, when you refused or kicked the can down the road, if you will, that Kimberley made herself present?

*A* That is correct.

*Q* And she would do this sometimes in the background of your call with Michael?

*A* Correct.

*Id.* at 536–37.

*Q* Did Michael—in your experience and knowledge of Michael, did he have the ability to make Kimberley stop?

*A* No.

*Q* When you were speaking with agents that day, on the 7th of July, did you tell them quote, *Truthfully I think it's Kimberley's drive to do all of this?*

…

*A* Yes.

*Id.* at 538–39.

*Q* Did you tell agents, *So, that's the truth of the matter. Like, I truly believe that. I think that the real driver of all of this was Kimberley, and that's just my opinion, whether or not it's a fact or not, I'm just—that's how—that's the vibe I got throughout all of this.* Do you recall saying that?

*A* Yes.

*Q* And, did you believe it to be true, at that time?

*A* Yes.

…

*Q* Okay. And after you said that to agents, do you recall saying that, *Michael was not doing this for his benefit at all?*

[*refreshed witness's recollection*]

*A* Yes.

*Q* And you remember being truthful with agents that day?

*A* Yes.

*Id.* at 541–42.

*Q* … [W]ould you agree with me that Kimberley Tew was omnipresent in Michael's life, in your interactions with him?

*A* Yes.

*Q* And you didn't know Michael to have a gambling problem, did he?

*A* I did not.

*Q* Is it fair to say that Michael had a Kimberley problem?

*MR. KAPLAN:* Objection, Your Honor.

*THE COURT:* Overruled.

*THE WITNESS:* Yes.

*Id.* at 546–47.

*Q* Do you have reason to believe that Ms. Tew had control issues?

*A* Yes.

*Q* Was she trying to be in control?

*A* Yes.

*Q* Did you ever hear Mrs. Tew go off on Michael, in a personal way?

*A* Yes.

…

*Q* … [S]he yelled at him a lot?

*A* Correct.

*Id.* at 544–55.

## D. Mrs. Tew's Second Motion for Severance

After Mr. Yioulos's testimony, Mrs. Tew again moved for severance, this time based on her husband's recently disclosed antagonistic defense:

> *MS. HUBBARD:* Your Honor, I just need to supplement the record. As being a former appellate lawyer, I'm sure you are aware that sitting over here we're constantly worried about waiving an issue. So, with respect to our Motion to Sever, if the Court recalls, the original Motion to Sever had to do with whether or not evidence would be admissible against Ms. Tew if she was in a separate trial, that was, kind of, one of the primary bases for our motion to sever.
>
> I want to supplement that, because, I believe, the Cross-examination, yesterday, done by Mr. Schall, put our defense of Ms. Tew directly at issue with the defense that they are running for Mr. Tew; specifically, as you heard, during opening statement, our defense of Ms. Tew relates to her knowledge and direct participation in the charged scheme, both as to wire fraud and as to money laundering. For purposes of money laundering one of the elements is that she has to know the funds that she is alleged to have moved between bank accounts or spent in different ways, were proceeds of illegal activity. And Ms. Tew's knowledge really goes to the core of our defense, and the—if the Court recalls yesterday, Mr. Schall emphasized, with Mr. Yioulos, Mr. Yioulos' perspective that Kimberley Tew *had them both by the balls*. They were kind of helpless. Essentially, that Kimberley Tew is the mastermind behind all of this. She is the motivating factor. She is the person driving the train. However you want to put it. She is the mover and shaker behind the whole scheme, which is in direct conflict with our theory of the case.
>
> So, I wanted to just make that record, which apologies, Your Honor, I will probably continue to do throughout trial, because I think that's what the case law requires. So, I just wanted to make that record on severance.

*Id.* at 696–97. The court thanked counsel for "supplementing the record" and took the matter under advisement. *See id.* at 697–706. Later that day, Mr. Tew filed a written motion for severance also based on the defendants' antagonistic defenses. R.2 at 729. The court later denied Mr. Tew's motion. *Id.* at 785.

**E. Mr. Tew's "Abusive Wife" Defense Continued**

Mr. Tew's antagonistic defense did not end with his counsel's cross examination of Mr. Yioulos. Rather, his attorneys emphasized the same themes during their cross-examination of almost every government fact witness:

- With Christopher Alf, National Air Cargo's owner and chairman, counsel posed questions prompting Mr. Alf to describe Mrs. Tew as an "emotional train wreck," stating that he didn't know "how Michael dealt with [her] on a daily basis." *Id.* at 884.
- With Hannah Scaife, a college friend of Mrs. Tew, counsel questioned her about an instance, unrelated to the alleged fraud, during which she "overheard Mrs. Tew berating Mr. Tew" and calling him names in the presence of their children. *Id.* at 765.
- With Abby Schwartz, an accountant at National Air Cargo, counsel elicited testimony about two "extremely unpleasant" encounters she had with Mrs. Tew, again unrelated to the alleged fraud, during which Mrs. Tew allegedly "yelled" and "scream[ed]" at her to issue an early payment on her husband's paycheck. *Id.* at 1021–22.

- With Michael Meyers, a Bitcoin trader who allegedly helped the Tews launder funds, counsel went out of their way to paint Meyers as a "weak," "vulnerable" victim of Mrs. Tew's "manipulat[ion]," eliciting testimony suggesting that he was "under [Mrs. Tew's] spell" and "[c]ouldn't break free." *Id.* at 1142–44.
- Finally, with Special Agent Palmer, counsel again emphasized Mrs. Tew's spending habits and gambling addiction, *id.* at 1604–07, 1610–12; posed questions suggesting that Mr. Tew was the better parent to the couple's two children, *id.* at 1607–08; and elicited testimony reiterating Mr. Yioulos's statements to law enforcement that Mrs. Tew was the "real driver" of the conspiracy and that she had him and Mr. Tew "by the balls." *Id.* at 1602–03.

These attacks continued through closing arguments. Mr. Tew's counsel started her closing by referring to Mrs. Tew as "the crazy one." *Id.* at 1750. "Most every witness who was not a law enforcement witness or an accountant came in[ and] explained to you how Kimberley Tew manipulated him or her," counsel argued, "and she did the same thing to her husband, Michael Tew." *Id.* Counsel repeatedly described Mrs. Tew as the one "driving the bus," the one reaping all the benefits—including "money to feed her uncontrollable gambling habit" and "lavish" lifestyle—all while Mr. Tew "got nothing." *Id.* at 1762–64. "Look at the way she speaks to Michael," counsel argued, "[l]ook at the way she speaks to other people. Screaming, threatening. Crazy." *Id.* at

1764. Counsel reiterated previous testimony describing Mrs. Tew as "emotionally manipulative" and "verbally abusive," including emphasizing Mr. Alf's statement that he had "no idea how [Mr. Tew] puts up with" his "screaming" wife. *Id.* at 1765–66.

Mr. Tew's counsel described Mrs. Tew as having a "magic" ability to "cast a spell" on people, convincing them to do "crazy things," including convincing a college friend to have an affair with her boss and "to sell her body for money." *Id.* at 1764–65. "I don't know what kind of spell Ms. Tew has cast over people like Hannah Scaife, Michael Meyers, Mr. Tew," counsel argued, "but boy is it some magic sauce." *Id.* Counsel made these statement while standing before an image (depicted below) entitled, "Ms. Tew's Influence," detailing all the testimony from other witnesses who claimed that Mrs. Tew had "manipulated or bullied them." R.2 at 1224.The slide concluded by asking, "How do you think she treated Michael Tew? *Id.*



In her final remarks, counsel analogized Mrs. Tew to a fire—a "crazy fire"—that Mr. Tew "couldn't … put out" and that ultimately "destroyed" and "ravaged" him. SR.1 at 1767. Counsel made these remarks while displaying a slide, depicting a text message from Mrs. Tew to Mr. Tew reading, "Figure out if you want to be in this family," set against a background of flames:




R.2 at 1225. In conclusion, counsel argued, "Michael Tew [was] only guilty of being married to Kimberley Tew." SR.1 at 1767.

### F. Ms. Tew's Motion for Mistrial and Renewed Motion for Severance

At the end of the fifth day of trial, Mrs. Tew moved for a mistrial, arguing that, together, the government and Mr. Tew's counsel had "made [her] out to be this devil"—"this mystical women who has the ability to control what everyone around her does." SR.1 at 1152. "There is a serious risk," counsel argued, "that the jury will convict Mrs. Tew, because they don't like her,

because they think she is a bad person, and not based on the evidence." *Id.* The court denied the motion without prejudice. *Id.* at 1155.

Mrs. Tew renewed her motion for severance at the close of the government's case. *Id.* at 1712. The court denied the motion. *Id.* She again renewed her motion for mistrial and motion for severance at the close of all of the evidence. *Id.* at 1798. The court again denied both motions, noting that it believed the issues were "properly preserved." *Id.*

The jury later returned a verdict, finding Mrs. Tew guilty on twelve of the fourteen counts charged against her (all but Counts 16[4] and 48) and Mr. Tew guilty on all 59 counts. R.2 at 923–48. The court later entered judgment against Mrs. Tew on August 13, 2024, sentencing her to 48 months' imprisonment. *Id.* at 61, 1328–35. This appeal followed.

## IV. SUMMARY OF THE ARGUMENT

The district court committed two reversible errors in this case.

*First*, the court erred in denying Mrs. Tew's motion to suppress the evidence and all fruits obtained from the search of her Apple ID account for lack of particularity in the warrant. The warrant allowed the government to search over 2½ years of Mrs. Tew's electronic records—including her emails, instant messages, text messages, phone records, video recordings, photographs, location data, financial records, and any other electronic records or information

[4] The court left Count 16 off the verdict form for Mrs. Tew, noting that the case had proceeded as though she was not charged on that count. SR.1 at 1655.

saved to her iCloud account or a device backed up to her iCloud account. The only limitation on the warrant's scope was that the evidence searched for had to be relevant to a violation of one of six broad "Target Offenses," including conspiracy, attempt, wire fraud, evidence tampering, or money laundering.

Notably, the warrant was not limited to Target Offense violations against National Air Cargo. While probable cause for the warrant was all tied to an alleged scheme by the Tews to defraud the company, the warrant itself was not so limited, allowing officers to search for and seize evidence of *any* Target Offense violation, regardless of its relation to National Air Cargo.

The warrant violates the Fourth Amendment's particularity requirement. The government cannot particularize a warrant by limiting its scope to evidence of violations of a broad federal statute. This Court has not only invalidated warrants, like the one here, allowing officers to search for evidence of generic violations of a broad federal statute (like the federal conspiracy statute), *Voss v. Bergsgaard*, 774 F.2d 402, 404–05 (10th Cir. 1985), but has held that such warrants are "overbroad on [their] face," such as to preclude application of the good-faith exception. *United States v. Leary*, 846 F.2d 592, 601, 609–10 (10th Cir. 1988). These principles apply with equal force here. The warrant for Mrs. Tew's Apple ID account was overbroad on its face. No reasonable officer could have relied on it. Suppression is required.

*Second*, the district court erred in denying Mrs. Tew's motion to sever her trial from her husband and codefendant, Michael Tew. Mrs. Tew made that

motion following the third day of trial, after her husband's counsel unexpectedly revealed a new defense strategy—claiming for the first time that Mrs. Tew had controlled and manipulated him into committing the alleged fraud. During the trial, Mr. Tew's counsel presented evidence and argument—

- that Mrs. Tew was "crazy," SR.1 at 1750;
- that she had a "kind of spell … cast over" him, *id.* at 1764;
- that she was "constantly yelling at him," *id.* at 1765;
- that she was emotionally manipulative and verbally abusive, *id.*;
- that she demeaned him in the presence of their children, *id.*
- that she had him and a coconspirator "by the balls," *id.* at 1764; and
- that she had an ability to "cast a spell" on people, convincing them to do "crazy" things, including convincing a college friend to have an affair with her boss and "to sell her body for money." *Id.* at 1765.

Mr. Tew's counsel described the conspiracy as fueled by Mrs. Tew's "uncontrollable gambling addiction," *id.* at 1762, claiming that she was the "real driver" of the conspiracy, *id.* at 1753, and that Mr. Tew was "only guilty of being married" to her. *Id.* 1767.

Mr. Tew's antagonistic, inflammatory defense destroyed Mrs. Tew's right to a fair trial. Mrs. Tew's defense focused on *mens rea*, highlighting the lack of evidence linking her as a knowing participant in the conspiracy. The

Tews' defenses were mutually exclusive. The jury could not have believed that Mrs. Tew was both unaware and uninvolved with the conspiracy while at the same time believing that she was the one who masterminded it. Mr. Tew's defense painted Mrs. Tew as nothing short of a monster, relying heavily on evidence of her prior bad acts and alleged manipulative character. In zealously pursuing their client's defense, Mr. Tew's counsel destroyed Mrs. Tew's right to a fair trial. The district court should have ordered a severance.

## V. ARGUMENT

### A. The district court erred in denying Mrs. Tew's motion to suppress.

The district court first erred in denying Mrs. Tew's motion to suppress the search of her Apple ID account for lack of particularity in the warrant. *See* R.3 at 111–12 (motion); R.1 at 692, 698 (order denying motion). The reasonableness of a search under the Fourth Amendment is a legal conclusion that this Court reviews de novo. *United States v. Loera*, 923 F.3d 907, 914 (10th Cir. 2019). This de novo standard applies to the Court's review of the "scope of the warrant," "the sufficiency of the warrant" (including whether it is sufficiently particularized), and "the applicability of the good faith exception." *Id.* at 914–15; *United States v. Sadlowski*, 948 F.3d 1200, 1203 (10th Cir. 2020).

Here, in denying Mrs. Tew's motion to suppress, the district court erred in holding (i) that the warrant was sufficiently particularized and (ii) that the good-faith exception applies. Mrs. Tew addresses each error in turn.

### 1. *The warrant fails to particularly describe the items to be seized.*

The Fourth Amendment requires that search warrants "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This limitation, known as the "particularity requirement," is meant to "prevent general searches," ensuring that a search does "not take on the character of the wide-ranging exploratory searches [that] the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

The particularity requirement achieves these objectives by requiring that those searches deemed necessary "be as limited as possible." *United States v. Webster*, 809 F.3d 1158, 1164 (10th Cir. 2016) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). Thus, a warrant must "describe the items to be seized with as much specificity as the government's knowledge and circumstances allow," *United States v. Suggs*, 998 F.3d 1125, 1132 (10th Cir. 2021) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)), leaving "nothing … to the discretion of the officer executing the warrant." *Mink v. Knox*, 613 F.3d 995, 1010 (10th Cir. 2010) (cleaned up).

One means of achieving this particularity is by limiting a warrant's scope to "evidence of specific … crimes." *United States v. Salas*, 106 F.4th 1050, 1057 (10th Cir. 2024). But "an unadorned reference to a broad federal statute" is not enough. *Leary*, 846 F.2d at 602. "While some federal statutes may be narrow enough to meet the fourth amendment's [particularity] requirement," statutes "cover[ing] a broad range of activity"—like conspiracy, wire

fraud, or money laundering—do "not constitute a constitutionally adequate particularization of the items to be seized." *Id.* at 601 (cleaned up); *see Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir. 1985) (conspiracy); *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990) (wire fraud); *United States v. Mokbel*, 2021 WL 4554660, at *4 (S.D. Tex. Oct. 5, 2021) (money laundering). As this Court has held, confining a search to violations of such statutes "places no real limitation on the warrant"—allowing "precisely the kind of [exploratory] rummaging … that the fourth amendment proscribes." *Voss*, 774 F.2d at 405; *accord Maxwell*, 920 F.2d at 1033 ("References to broad statutes realistically constitute no limitation at all on the scope of an otherwise overbroad warrant and therefore cannot save it."); *United States v. Roche*, 614 F.2d 6, 8 (1st Cir. 1980) (describing such limitations as "no limitation at all").

These same principles apply to searches involving electronically stored information. As this Court has recognized, the particularity requirement has become "much more important in the context of electronic searches." *Salas*, 106 F.4th at 1057 (cleaned up). This is so because computers have the "ability to store and intermingle a huge array of one's personal papers in a single place" thus "increas[ing] law enforcement's ability to conduct a wide-ranging search into a person's private affairs." *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). Thus, this Court's precedents require that a warrant for an electronic search "*affirmatively limit*" its scope "to evidence of specific federal crimes or specific types of material." *Id.* And again, a broad federal

statute won't suffice. As with any other search, the referenced statutory violation must be "narrow enough to meet the fourth amendment's requirements." *United States v. Burke*, 633 F.3d 984, 992 (10th Cir. 2011) (quoting *Leary*, 846 F.2d at 601) (applying same principle to computer search).

Here, the warrant for Mrs. Tew's Apple ID account comes nowhere close to meeting these standards. The warrant allowed the government to rummage through virtually all of Mrs. Tew's electronic records over a 2½ year period—including her emails, instant messages, text messages, phone records, video recordings, photographs, location data, financial records, and any other electronic records or information saved to her iCloud account or a device that backed up to her iCloud account. The only limitation on the warrant's scope was that the evidence searched for had to be relevant to a violation of one of six broad "Target Offenses," namely, 18 U.S.C. § 371 (conspiracy), § 1343 (wire fraud), § 1349 (attempt or conspiracy), § 1519 (evidence tampering), § 1956 (money laundering), or § 1957 (transactional money laundering). R.3 at 199. As this Court's cases make clear, confining a search to violations of such statutes "places no real limitation on the warrant, *Voss*, 774 F.2d at 405, and thus does "not constitute a constitutionally adequate particularization of the items to be seized." *Leary*, 846 F.2d at 602.

The district court's contrary reasoning lacks merit. It held the warrant was sufficiently particularized because it was limited "to evidence related to

specific statutes and a specific scheme against the named victim company" and was "cabined to a particular date range." R.1 at 698.

This reasoning folds under scrutiny.

*First*, the "specific statutes" the court referenced are precisely the sort of "broad federal statute[s]" that this Court has held fail to sufficiently particularize a warrant. *Leary*, 846 F.2d at 601–02; *Voss*, 774 F.2d at 405. Simply put, they pose "no real limitation." *Voss*, 774 F.2d at 405.

*Second*, while it's possible to particularize a warrant by "affirmatively limit[ing]" its scope to "to evidence of specific federal crimes," *Otero*, 563 F.3d at 1132, here, contrary to the district court's reasoning, nothing in the warrant affirmatively limits its scope to "evidence related to … a specific scheme against the named victim company." R.1 at 698. Rather, the warrant merely mentions "information about … a conspiracy or scheme to defraud National Air Cargo" as an example of the sort of information "include[d]" within the warrant's scope, R.3 at 199, thus making clear that the warrant allowed officers to search for and seize evidence of *any* Target Offense violation, regardless of its relevance to National Air Cargo. *See United States v. Stephen*, 984 F.3d 625, 632 (8th Cir. 2021) (holding the word "includes" in a search warrant indicated that the thing listed "was illustrative not exhaustive"); *United States v. Porter*, 745 F.3d 1035, 1046 (10th Cir. 2014) (noting that "common sense clearly indicates" the word "including" introduces an "illustrative" rather than an "exhaustive" list, and thus "may include other things"

(cleaned up)); Antonin Scalia & Bryan A. Garner, *Reading Law* 122 (2012) ("The verb *to include* introduces examples, not an exhaustive list"). In short, the warrant's mention of National Air Cargo is not an affirmative limitation but at most a non-exhaustive example. *See id.*

*Finally*, the fact that the warrant allowed the government to rummage through 2½ years of Mrs. Tew's electronic records hardly reflects the level of particularity that the Fourth Amendment requires. Just think about it: 2½ years of emails, instant messages, text messages, phone records, video recordings, photographs, location data, financial records, iCloud records, and device backups. That's a *huge* amount of data. *See* Orin Kerr, *The Digital Fourth Amendment* 27 (2025) ("Computers not only store private information. They also store *a lot* of it. These days, almost any digital device can keep a library's worth of data. When the government searches a computer, it is not just searching the digital equivalent of a home. Instead, it is looking through a vast warehouse."). Given the way we use our phones, computers, email, and cloud accounts, the information encompassed within the warrant's scope would give law enforcement a window into virtually every aspect of Mrs. Tew's personal life. *See id.* at 24–27; *Otero*, 563 F.3d at 1132. Without some other meaningful limitation to draw down the warrant's scope, a 2½ year temporal limitation comes nowhere close to achieving the level of particularity that the Fourth Amendment requires. It's still a general warrant.

Crucially, this is not a case where the government lacked the information needed to make the warrant more particular. As set out in the warrant application, the government's probable cause for seeking the warrant was all tied to an alleged scheme to steal and launder funds from National Air Cargo. SR.3 at 177–89. The government could've easily limited the warrant to evidence of Target Offense violations relevant to that alleged scheme. Indeed, in upholding the warrant as sufficiently particularized, the district court acted under the mistaken assumption that the warrant included that exact limitation. R.1 at 698. But it doesn't. R.3 at 199. The warrant does not "describe the items to be seized with as much specificity as the government's knowledge and circumstances allow[ed]." *Leary*, 846 F.2d at 600; *see Cassady v. Goering*, 567 F.3d 628, 636 (10th Cir. 2009). The warrant fails for lack of particularity.

### 2. *The warrant is facially overbroad, precluding application of the good-faith exception.*

The district court further erred in denying Mrs. Tew's motion to suppress under the *Leon* "good faith" exception. That exception permits the admission of evidence obtained in violation of the Fourth Amendment if the officer who conducted the search acted in good-faith reliance on a warrant later determined to be invalid. *United States v. Leon*, 468 U.S. 897, 918–23 (1984). The standard under the exception is one of "objective reasonableness," requiring courts to ask, "whether a reasonably well-trained officer"—that is, an officer "with reasonable knowledge of what the law prohibits"—"would have

known that the search was illegal." *Id.* at 919 n.20, 922 n.23, 924. The government bears the burden of proving that the exception applies. *United States v. Roach*, 582 F.3d 1192, 1204 (10th Cir. 2009).

The government cannot meet that burden here. The warrant in this case allowed the government to conduct a full-scale exploratory rummaging through 2½ years of Mrs. Tew's electronic records and communications without any limiting principle whatsoever. Any officer with reasonable knowledge of what the law requires would have known that you cannot particularize a warrant by limiting its scope to evidence of violations of a broad federal statute, like the six Target Offenses. *Leary*, 846 F.2d at 609–10. That principle has been clearly and consistently recognized in this circuit and others for almost four decades now. *Id.*; *Voss*, 774 F.2d at 405; *Maxwell*, 920 F.2d at 1033; *Roche*, 614 F.2d at 8; *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992). Given the warrant's facial defects, no reasonable officer would've relied on it.

A warrant's invalidity under established circuit precedent will often preclude application of the good-faith exception. *See United States v. Herrera*, 444 F.3d 1238, 1253 (10th Cir. 2006); *see also United States v. Dunn*, 719 F. App'x 746, 752 n.4 (10th Cir. 2017); *Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004). Here, this Court has multiple decisions on the books that would have alerted a reasonable officer to the warrant's invalidity. Three cases stand out in particular: *Voss*, *Leary*, and *Cassady*. The defense addresses each in turn.

Start with *Voss*. That case involved a challenge to a warrant obtained as part of a criminal tax investigation. 774 F.2d at 403. While the probable cause for the warrant was all tied to a specific tax fraud scheme, the warrant itself was not so limited, allowing officers to search the target company's business records, subject only to the limitation that the items seized constitute evidence of a violation of the federal conspiracy statute, 18 U.S.C. § 371. *Id.* at 404–05. This Court found the warrant invalid. *Id.* In doing so, it stressed the extreme breadth of the federal conspiracy statute, holding that the warrant's reference to the statute "place[d] no real limitation on the warrant." *Id.* at 405. This is so, the Court explained, because the conspiracy statute "prohibit[s] conspiracies to violate *any* federal statute"—not just tax fraud—thus allowing officers to search for and seize "evidence of … previously unsuspected crimes" "for which there [was no] demonstrated probable cause." *Id.* at 404–05 (emphasis added). Thus, as an example, the Court noted that the warrant would have allowed officers to search for and seize evidence of a "conspiracy … to import marijuana, even if unrelated to tax fraud," "despite the fact that the government [had] presented no evidence even suggesting probable cause for believing a drug crime had been committed." *Id.* at 405. For these reasons, the Court held the warrant was invalid.

This Court built on these principles in *Leary*. *Leary* involved a challenge to a warrant obtained to search the offices of a company suspected of violating federal export laws. 846 F.2d at 594. In particular, the warrant allowed officers

to seize records and communications relating to violations of two federal export statutes, the Arms Export Control Act, 22 U.S.C. § 2778, and the Export Administration Act of 1979, 50 U.S.C. § 2410. *Id.* Following the search, the government charged two of the company's executives with conspiracy to violate federal export laws. *Id.* The defendants later moved to suppress the evidence and all fruits obtained from the search, arguing the warrant failed for lack of particularity. *Id.* at 595. The district court agreed and granted the defendants' motion. *Id.* This Court affirmed. *Id.* at 594. In doing so, it held the warrant was "overbroad on its face," analogizing it to the warrant at issue in *Voss*. *Id.* at 601. In drawing that analogy, the Court rejected the government's argument that *Voss* was inapplicable because the federal export statutes were narrow enough to particularize the warrant: "While some federal statutes may be narrow enough to meet the … [particularity] requirement," the Court held, "the two [export] statutes cited by the … warrant [here] cover a broad range of activity" and thus do "not sufficiently limit the [warrant's] scope." *Id.*

Relevant here, the Court in *Leary* found that the warrant in that case was so facially deficient as to preclude application of the good-faith exception: "A reasonably well-trained officer should know that a warrant must provide guidelines for determining what evidence may be seized," the Court reasoned, and a "warrant that directs an officer to seize records 'relating to' violations of the federal export laws offers no such guidelines." *Id.* at 609. Because the

warrant was "overbroad on its face," the Court held "that the 'good faith' exception [was] inapplicable." *Id.* at 601, 610.

Finally, there's this Court's decision in *Cassady*. That case involved a warrant to search a farm suspected of growing marijuana. 567 F.3d at 632. While the warrant identified certain specific drug-related items for seizure, it concluded with a broad catchall provision, allowing officers to search for and seize "all other evidence of criminal activity." *Id.* at 635. This Court held the warrant invalid for lack of particularity. *Id.* at 632, 635. "The officers only had probable cause to search for evidence related to marijuana cultivation," the Court noted, "yet the warrant authorized the seizure of *all* possible evidence of *any* crime in *any* jurisdiction." *Id.* at 635. The Court described the warrant as the "epitom[e of] a general warrant," *id.* at 641, holding that its violation of the landowner's Fourth Amendment rights was "clearly established," such that "no reasonable officer could [have] believe[d] that [the] warrant …was valid," thus precluding qualified immunity. *Id.* at 643–44.[5]

Any one of these three cases would have alerted a reasonable officer that the warrant here was invalid. The warrant for Mrs. Tew's Apple ID account allowed officers to search for and seize evidence of violations of any one of six

[5] *Cassady*'s ruling on qualified immunity is equivalent to a holding barring application of the good-faith exception. *See Dunn*, 719 F. App'x at 752 n.4 ("[T]he test [for qualified immunity] is the same as the one for the good-faith exception."); *Groh*, 540 U.S. at 565 n.8 ("[T]he same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer.").

broad Target Offenses—including conspiracy, wire fraud, attempt, evidence tampering, and money laundering. R.3 at 199. That authorization is even broader than the warrants deemed invalid in *Voss* and *Leary*. There, the warrants at least limited the search to evidence of one or two broad federal statutes. Here, the warrant expands the search to six—including the very same conspiracy statute that alone was held so broad as to invalidate the warrant in *Voss*. Indeed, it's hard to think of any criminal activity prohibited under federal law that this warrant would not have allowed officers to search for. As this Court recognized in *Cassady* and *Leary*, no reasonable officer could rely on a warrant this facially overbroad. Suppression is warranted.

### B. The district court erred in denying Mrs. Tew's midtrial motion for severance based on her husband's mutually antagonistic defense.

The district court also erred in denying Mrs. Tew's midtrial motion for a severance. That motion asked the court to sever Mrs. Tew's trial from her husband's based on her husband's then-recently disclosed antagonistic defense strategy. Courts in the Tenth Circuit employ a three-step inquiry in deciding whether antagonistic defenses warrant a severance:

> First, [the court] must determine whether the defenses presented are so antagonistic that they are mutually exclusive. Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence. Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by

> joinder against the obviously important considerations of economy and expedition in judicial administration.

*United States v. Pursley*, 474 F.3d 757, 765 (10th Cir. 2007) (cleaned up). This Court reviews a denial of a severance motion for abuse of discretion. *Id.*

Here, these factors each show that the district court erred in denying Mrs. Tew's severance motion. The defense addresses each factor in turn. [6]

---

[6] Mrs. Tew preserved this issue via her counsel's oral motion for severance, SR.1 at 696–97, and later motion for mistrial. *Id.* at 1152. The government has previously argued that Mrs. Tew waived this issue by failing to move for severance based on her husband's antagonistic defense before trial. This is wrong. Under Rule 12, a motion for severance must be raised prior to trial "if the basis for the motion is then reasonably available." Fed R. Crim. P. 12(b)(3)(D). This quoted language was added to the rule in 2014 in recognition of the fact "that in some cases, a party may not have access to the information needed to raise [a] particular [severance motion] prior to trial." Fed. R. Crim. P. 12, advisory committee notes to 2014 amendments. In such cases, a midtrial severance motion is not untimely, nor is the court's review of the motion limited to plain error or good cause shown. *United States v. Warren*, 728 F. App'x 249, 254–55 (5th Cir. 2018); *cf. Schaffer v. United States*, 362 U.S. 511, 516 (1960) ("[T]he trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.").

Here, Mrs. Tew moved for severance based on her husband's antagonistic "abusive wife" defense as soon as the basis for that motion became available, namely, after Mr. Tew's counsel finished cross-examining Mr. Yioulos. Up to that point, Mrs. Tew had no notice that her husband intended to pursue this strategy. R.2 at 733–34. He didn't preview it at any hearings or in any pretrial filings, nor did his counsel even refer to it in opening statements. SR.1 at 176–82. Under the circumstances, even if Mrs. Tew could have surmised that her husband might pursue an antagonistic defense at trial, such speculation would not have presented a "reasonably available" basis for severance. *See Warren*, 728 F. App'x at 254–55 ("Even if Kristy Le could surmise in advance that her co-defendants might turn on her, she would have nothing to show a 'serious risk' that it would prejudice her [as required for severance under Rule 14].

### 1. *The Tews' defenses were mutually antagonistic.*

The first *Pursley* factor considers whether the defenses presented are "mutually antagonistic." *Id.* "Defenses are mutually antagonistic if the conflict between codefendants' defenses is such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *Id.* (cleaned up). "It is not necessary for each defendant to base the core of his defense on the direct accusation of his co-defendant." *United States v. Romanello*, 726 F.2d 173, 177 (5th Cir. 1984). Rather, "[m]utual exclusivity may exist when 'only one defendant accuses the other, and the other denies any involvement.'" *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991) (quoting *Romanello*, 726 F.2d at 117).

Here, Mr. and Mrs. Tew's defenses meet this definition. The jury could not have believed Mrs. Tew's *mens rea* defense while at the same time crediting her husband's defense that she was the "real driver" of the conspiracy, who controlled and manipulated him into carrying out the fraudulent invoicing scheme for her benefit. Simply put, the jury could not have believed that

---

Thus, we conclude that the basis for her motion was not 'reasonably available' before trial, and she was not subject to Rule 12's pre-trial filing requirement." (citation omitted)); *United States v. Dirden*, 38 F.3d 1131, 1141 (10th Cir. 1994) ("[T]he mere possibility of antagonistic defenses provides an inadequate basis for severing trials."). Because the basis for Mrs. Tew's severance motion was not "reasonably available" before trial, her midtrial motion for severance was timely and properly preserved the issue.

Mrs. Tew was both unaware of and uninvolved with the conspiracy while at the same time believing that she was the one who masterminded it. *See id.*

This Court's decision in *United States v. Jones*, 530 F.3d 1292 (10th Cir. 2008), is not to the contrary. The government argues that *Jones* forecloses Mrs. Tew's severance argument, claiming *Jones* holds that defenses are not mutually exclusive when "one defendant insist[s] that he did not … commit fraud" and "his co-defendant paint[s] him as the 'head' of the scheme." *See Gov't Resp. to Appellant's Mot. for Release Pending Appeal* at 12 (10th Cir. ECF 24). But that is not what *Jones* says.

*Jones* involved two defendants, Wright and Jones, jointly charged in a bank fraud conspiracy. The core of Wright's defense "was that the government's witnesses were lying and that he did not in fact commit bank fraud or enter into a conspiracy to do so." *Id.* at 1304. The core of Jones's defense was that she "did not knowingly commit bank fraud." *Id.* While Jones's counsel made "some statements" that were antagonistic to Wright's defense—including at one point claiming that he was the "head" of the scheme—the Court dismissed those remarks as not part of Jones's "core" defense, noting that "Wright's guilt was not … an indispensable component of her theory of the case." *Id.* The Court thus rejected Wright's claim that his and Jones's defenses were mutually exclusive, reasoning that "the jury could have simultaneously believed that the government's witnesses were lying about Wright's

involvement in the bank fraud conspiracy and that Jones did not knowingly commit bank fraud." *Id.*

This same reasoning does not apply here. Unlike in *Jones*, Mr. Tew did not deny committing fraud. Rather, the "core" of his defense was that his wife controlled and manipulated him into doing so, repeatedly referring to her as the "real driver" of the conspiracy. That defense directly conflicts with Mrs. Tew's defense that she was not a knowing participant in the alleged fraud. Unlike in *Jones*, there is no way to reconcile these defenses.

### 2. *Mr. Tew's antagonistic defense compromised the jury's ability to make a reliable determination about Mrs. Tew's guilt or innocence.*

"[B]ecause mutually antagonistic defenses are not prejudicial per se, a defendant" seeking severance on such grounds "must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence." *Pursley*, 474 F.3d at 765. "Such actual prejudice is shown if the defenses are truly mutually exclusive, such that 'the jury could not believe the core of one defense without discounting entirely the core of the other.'" *Fox v. Ward*, 200 F.3d 1286, 1293 (10th Cir. 2000) (quoting *Dirden*, 38 F.3d at 1141). This is so not only because "there is a danger the jury will unjustifiably infer from the conflict alone that both defendants are guilty," *Peveto*, 881 F.2d 857, but also because such defenses "bring the effect of a second prosecutor into the case," causing the "presentation of the codefendant's case to become a separate forum in which

the defendant is accused and tried." *Tootick*, 952 F.2d at 1082. These risks are "exacerbated," where, as here, "one defendant admits some or all of the elements of the charge." *Peveto*, 881 F.2d at 858, or presents inflammatory, emotionally charged evidence or argument against the codefendant—such as accusing the codefendant of manipulating or coercing the defendant's involvement in the charged offense. *See United States v. Breinig*, 70 F.3d 850, 853 (6th Cir. 1995); *United States v. Blunt*, 930 F.3d 119, 126 (3d Cir. 2019); *United States v. Green*, 114 F.4th 163, 178 (3d Cir. 2024).

Here, Mr. Tew's antagonistic defense deprived Mrs. Tew of her right to a fair trial. Not only was his defense mutually exclusive with hers, but it relied heavily on evidence of Mrs. Tew's alleged prior bad acts and manipulative character. The result was to pit Mrs. Tew against not just one prosecution team, but two—one working for the government and the other for her husband, both playing off each other to paint Mrs. Tew as a controlling, manipulative wife, who, having her husband "by the balls," bullied and intimidated him and others into carrying out the fraudulent scheme to feed her "uncontrollable gambling habit." SR.1 at 1754, 1762. Mr. Tew's counsel described Mrs. Tew not only as "emotionally manipulative" and "verbally abusive," but as possessed with almost witch-like powers to "cast spells" on people, causing them to do "crazy" things, like have affairs, prostitute themselves, and—in Mr. Tew's case—defraud his former employer. *See id.* at 1764–66.

As courts have recognized, such antagonism from a codefendant (particularly one's spouse) is inherently prejudicial, warranting a severance. On this point, the Third Circuit's decisions in *Blunt* and *Green* and the Sixth Circuit's decision in *Breinig* are instructive.

Start with *Blunt*. That case involved a husband and wife jointly tried on charges stemming from an identity theft conspiracy. 930 F.3d at 121. At trial, the wife pursued an antagonistic defense, painting her husband "as the instigator of the scheme," who "coerced and threatened" her "reluctant … participant[ion]." *Id.* at 122–23. The husband was later convicted on multiple counts and sentenced to 116 months' imprisonment. *Id.* at 124. He appealed, arguing that the district court erred in denying his motion for severance based on his wife's mutually antagonistic defense. *Id.* The Third Circuit agreed and reversed. *Id.* at 126–27. It held that the wife's testimony against her husband, describing instances of threatened and actual violence, "clearly would tend to elicit an inappropriate emotional response from the jurors, resulting in unfair prejudice." *Id.* at 126. "[W]e are compelled to find that the District Court abused its discretion," the Third Circuit held, in failing to correct these issues at the conclusion of the case, after the "prejudice against the [husband], both from an emotional and evidentiary standpoint, as a result of the [wife's] testimony had been made clear." *Id.* at 126–27. The Court thus vacated the husband's conviction and sentence and remanded for a new trial. *Id.* at 127.

The Third Circuit again faced these same issues in *Green*. That case involved two defendants, Murphy and Green, jointly charged with kidnapping. 114 F.4th at 170. At trial, Murphy "extensively portrayed himself as Green's victim," claiming Green "coerced [him] into assisting [with the] kidnapping"—a theory mutually exclusive with Green's defense "that there [had been] no kidnapping." *Id.* at 170, 179. The jury later convicted Green and acquitted Murphy. *Id.* at 171. Green appealed, arguing that the district court abused its discretion in denying his motion for a severance. *Id.* at 169, 171–72. The Third Circuit again agreed and reversed. *Id.* at 169. While acknowledging the "heavy" burden Green faced in establishing such error, the Court nonetheless found that he had "made his required showing." *Id.* at 171, 179. "Green suffered clear and substantial prejudice" as a result of Murphy's antagonistic defense, the Court held, "and the only appropriate remedy … is to reverse the denial of Green's motion to sever and vacate Green's conviction." *Id.* at 179. In doing so, the Court stressed that "Murphy's claim of innocence was predicated solely on Green's guilt"—a claim "irreconcilable" with Green's story that no kidnapping had occurred. *Id.* at 179–80 (cleaned up). Rejecting the district court's holding that a jury could "reasonably be expected to compartmentalize [such] evidence," the Court reversed, holding the risk of prejudice was "substantial" and "require[d] a remedy." *Id.*

Finally, there is the Sixth Circuit's decision in *Breinig*. That case involved a husband and wife jointly charged with willfully attempting to evade

taxes. 70 F.3d at 851. At trial, the wife presented a "diminished capacity" defense, claiming "that she lacked the capacity to form the requisite *mens rea* to have evaded taxes 'wilfully' because she was dominated and controlled by [her husband]." *Id.* at 851–52. The husband, meanwhile, claimed ignorance, arguing that "he had no knowledge of the underreporting" "because [his wife] kept all the books and an accounting firm prepared their taxes." *Id*.at 852. As part of her diminished capacity defense, the wife presented evidence that the husband had repeatedly "abandoned" and "manipulated" her, resulting in her "extreme dependence" on him. *Id.* The jury convicted the husband and acquitted the wife. *Id.* at 851. The husband appealed, arguing that his wife's "sharply antagonistic" defense warranted a severance. *Id.* at 853. The Sixth Circuit agreed and reversed. *Id.* at 851. In doing so, the Court stressed that the wife's defense allowed for the introduction of "highly inflammatory evidence of [her husband's] bad character"—evidence that "severely and unfairly prejudiced the defendant." *Id.* at 853. "The jury was told, by well-credentialed experts, that [the husband] was an adulterous, mentally abusive, and manipulating spouse," the Court noted—evidence that "provided the government with an unfair windfall that the rules of evidence and elemental notions of fairness would not otherwise allow." *Id.* The Court thus vacated the husband's conviction and sentence and remanded for a new trial. *Id.* at 854.[7]

---

[7] In addition to *Blunt*, *Green*, and *Breinig*, other relevant, factually analogous cases include *United States v. Swan*, 2013 WL 3422022, at *1–2, 4–6 (D. Me. July 8, 2013) (holding defendant-husband was entitled to severance from his

Here, as in each of these cases, Mrs. Tew had to go to trial with a codefendant who not only admitted that the crime occurred, but blamed her for the codefendant's involvement, claiming that Mrs. Tew bullied and manipulated him into committing the alleged fraud. The evidence and argument presented by her husband's counsel painted Mrs. Tew as nothing short of a monster, describing their own client as "only guilty of being married to" her. SR.1 at 1767. In zealously pursuing their client's defense, Mr. Tew's counsel destroyed Mrs. Tew's right to a fair trial. Their cases should have been severed.

### 3. *The level of extreme prejudice to Mrs. Tew caused by her husband's antagonistic defense required that their cases be severed.*

As the Supreme Court has recognized, Fed. R. Crim. P. 14 does not always require severance in the case of prejudicial joinder, instead leaving the "tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The final *Pursley* factor considers whether the trial court abused its discretion in limiting itself to relief short of severance. 474 F.3d at 765. While in some cases "less drastic measures," like limiting instructions, may "suffice to cure any risk of

---

codefendant-wife in a fraud case where the wife's defense was based on allegations of "spousal abuse," claiming she acted out of "fear" from her "controlling and … abusive husband," noting that such evidence would likely impair the jury's ability to decide the charges against the husband "fairly on the merits"), and *United States v. Troiano*, 426 F. Supp. 2d 1129, 1135 (D. Haw. 2006) (holding defendants' antagonistic defenses warranted severance, where one defendant's "proffered defense was that [his codefendant] was a 'predator' who bullied and manipulated him into" assisting with the charged robbery while the codefendant's defense was that "he did not commit the robbery").

prejudice," *Zafiro*, 506 U.S. at 539, such "instructions are not a panacea." *Green*, 114 F.4th at 180. The greater the risk of prejudice, the "more likely [a court is] to determine that separate trials are necessary." *Zafiro*, 506 U.S. at 539; *Green*, 114 F.4th at 180 ("In some cases, the risk of prejudice will be so high that severance is required.").

Here, for the reasons previously stated, the level of extreme prejudice to Mrs. Tew caused by her husband's antagonistic defense required that their cases be severed. As courts have recognized, a trial court abuses its discretion when denying severance under circumstances like those present here. *See Blunt*, 930 F.3d at 125–27; *Breinig*, 70 F.3d at 851–53; *Green*, 114 F.4th at 179–80. The district court erred in denying Mrs. Tew's motion for severance.

## VI. CONCLUSION

Mrs. Tew did not receive a fair trial in this case. It was a trial dominated by evidence obtained in violation of her Fourth Amendment rights, where she was forced to defend herself against accusations from not just the prosecution, but her own husband—who, through counsel, repeatedly accused her of manipulating and bullying him into committing the fraud of which they were both accused. This should never have happened. The district court erred in denying Mrs. Tew's motion to suppress and motion for severance. For these reasons, the Court should vacate Mrs. Tew's convictions and sentence and remand for further proceedings.

Respectfully submitted,

*/s/ Justin A. Lollman*
Justin A. Lollman, OBA No. 32051
GableGotwals
110 N. Elgin Ave., Ste 200
Tulsa, Oklahoma 74120-1495
918-595-4800
*jlollman@gablelaw.com*

Counsel for Appellant
Kimberley Ann Tew

## STATEMENT REGARDING ORAL ARGUMENT

Mrs. Tew requests oral argument in order to assist the Court in its consideration of the significant Fourth Amendment and Rule 14 severance issues raised in this appeal, including responding to any questions of the panel that the parties have not adequately covered in their briefs. The Fourth Amendment issues at stake in this case raise important questions concerning the government's right to issue broad warrants for *enormous* amounts of user data from cloud storage providers, like Apple, Google, and Microsoft—data that can often provide a window into virtually every aspect of the user's personal life. The severance issues at stake are equally significant, raising important questions in this circuit concerning when mutually antagonistic defenses require a severance. These are important, recurring issues, warranting the sort of thorough consideration and vetting that oral argument can help provide.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,985 words,[8] excluding the parts of the motion exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity Text A style font.

*/s/ Justin A. Lollman*
Justin A. Lollman

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2025, I electronically filed the foregoing document with the Clerk of Court for the United State Court of Appeals for the Tenth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Justin A. Lollman*
Justin A. Lollman

[8] This word count includes the 146 words depicted on the two images on pages 17 and 18, *supra*.