No. 24-1333

In the United States Court of Appeals
for the Tenth Circuit

---

**United States of America**,
Plaintiff-Appellee,

v.

**Kimberley Ann Tew**,
Defendant-Appellant.

---

On Appeal from the United States District Court
for the District of Colorado

Honorable Daniel D. Domenico
D.C. No. 20-cr-00305-2-DDD

---

# United States' Answer Brief

---


Peter McNeilly
United States Attorney

Rajiv Mohan
Assistant U.S. Attorney
1801 California Street
Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100

Attorneys for Appellee


**ORAL ARGUMENT IS NOT REQUESTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

STATEMENT OF RELATED CASES ........ vii

JURISDICTIONAL STATEMENT ........ vii

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 2

I. The Tews defraud National Air Cargo of more than $5 million ........ 2

II. The Tews are charged with numerous federal crimes. The district court warns them about antagonistic defenses but permits joint representation ........ 6

III. The district court denies Kimberley's pretrial suppression and severance motions. The Tews ask for and receive separate counsel ........ 9

A. The court denies the Kimberley's suppression motion ........ 10

B. The court denies Kimberley's severance motion ........ 11

C. The Tews ask for and receive separate counsel ........ 12

IV. The Tews are convicted. During trial, Kimberley "supplements the record" on severance ........ 13

SUMMARY OF ARGUMENT ........ 21

ARGUMENT ........ 24

I. The Apple ID warrant was sufficiently particular. The good-faith exception applies in any event ........ 24

A. The warrant was sufficiently particular ........ 26

B. The good-faith exception applies .......... 33

II. Tew failed to preserve her severance claim. The district court did not abuse its discretion .......... 36

A. Tew failed to preserve her severance claim .......... 36

*1. Tew failed to raise her severance claim before trial as required by Rule 12* .......... 36

*2. Tew's attempts to raise her severance claim during trial were inadequate* .......... 43

B. The district court did not abuse its discretion in holding a joint trial .......... 48

*1. The Tews' defenses were not mutually exclusive* .......... 49

*2. A joint trial did not compromise any specific trial right or the jury's ability to reach a reliable verdict* .......... 54

*3. Any prejudice was outweighed by concerns over economy and expedition* .......... 58

CONCLUSION .......... 59

CERTIFICATE OF COMPLIANCE .......... 60

CERTIFICATE OF SERVICE .......... 61

## TABLE OF AUTHORITIES

### Federal Cases


*Bruton v. United States*,
391 U.S. 123 (1968) .......... 11

*Cassady v. Goering*,
567 F.3d 628 (10th Cir. 2009) .......... 35

*Schaffer v. United States*,
362 U.S. 511 (1960) .......... 41

*Tesone v. Empire Mktg. Strategies*,
942 F.3d 979 (10th Cir. 2019) .......... 25, 46

*United States v. Ansberry*,
976 F.3d 1108 (10th Cir. 2020) .......... 45

*United States v. Blunt*,
930 F.3d 119 (3d Cir. 2019) .......... 57

*United States v. Bowline*,
917 F.3d 1227 (10th Cir. 2019) .......... 43

*United States v. Breinig*,
70 F.3d 850 (6th Cir. 1995) .......... 57

*United States v. Burgess*,
576 F.3d 1078 (10th Cir. 2009) .......... 26, 32

*United States v. Cates*,
73 F.4th 795 (10th Cir. 2023) .......... 46

*United States v. Cooper*,
654 F.3d 1104 (10th Cir. 2011) .......... 29

*United States v. Dirden*,
38 F.3d 1131 (10th Cir. 1994) .......... 42

*United States v. Gaye*,
130 F.4th 865 (10th Cir. 2025) .......... 28

*United States v. Graham*,
663 F. App'x 622 (10th Cir. 2016) (unpublished) .......... 42

*United States v. Green*,
114 F.4th 163 (3d Cir. 2024) .......... 57, 58

*United States v. Hernandez-Rodriguez*,
352 F.3d 1325 (10th Cir. 2003) .......... 25

*United States v. Herrera*,
51 F.4th 1226 (10th Cir. 2022) .......... 37, 43

*United States v. Irving*,
665 F.3d 1184 (10th Cir. 2011) .......... 47

*United States v. James*,
590 F.2d 575 (5th Cir. 1979) .......... 13

*United States v. Jones*,
530 F.3d 1292 (10th Cir. 2008) .......... 40, 48, 49, 50, 56, 58

*United States v. Lamport*,
787 F.2d 474 (10th Cir. 1986) .......... 32

*United States v. Le*,
173 F.3d 1258 (10th Cir. 1999) .......... 31

*United States v. Leary*,
846 F.2d 592 (10th Cir. 1988) .......... 29, 30

*United States v. Leffler*,
942 F.3d 1192 (10th Cir. 2019) .......... 47, 48

*United States v. Maxwell*,
920 F.2d 1028 (D.C. Cir. 1990) .......... 31

*United States v. Meridyth*,
364 F.3d 1181 (10th Cir. 2004) .......... 45

*United States v. Otero*,
563 F.3d 1127 (10th Cir. 2009) .......... 32, 34

*United States v. Palms*,
21 F.4th 689 (10th Cir. 2021)........................................25, 26, 28, 34

*United States v. Pursley*,
474 F.3d 757 (10th Cir. 2007)..................................................40, 56

*United States v. Roche*,
614 F.2d 6 (1st Cir. 1980)..............................................................31

*United States v. Russian*,
848 F.3d 1239 (10th Cir. 2017)..........................................33, 34, 35

*United States v. Salas*,
106 F.4th 1050 (10th Cir. 2024)........................................26, 31, 33

*United States v. Stein*,
819 F. App'x 666 (10th Cir. 2020) (unpublished)...........................25

*United States v. Suggs*,
998 F.3d 1125 (10th Cir. 2021)..................................................30, 32

*United States v. Wagner*,
951 F.3d 1232 (10th Cir. 2020)........................................................32

*United States v. Wardell*,
591 F.3d 1279 (10th Cir. 2009)........................................................43

*Voss v. Bergsgaard*,
774 F.2d 402 (10th Cir. 1985)..................................................29, 30

*Zafiro v. United States*,
506 U.S. 534 (1993)......................................................................54, 55

**Federal Statutes & Rules**

18 U.S.C. § 2..........................................................................................7

18 U.S.C. § 371...............................................................................27, 29

18 U.S.C. § 1343...............................................................................7, 27

18 U.S.C. § 1349...............................................................................7, 27

18 U.S.C. § 1519 ........ 27

18 U.S.C. § 1956 ........ 7, 27

18 U.S.C. § 1957 ........ 7, 27

18 U.S.C. § 3231 ........ vii

28 U.S.C. § 1291 ........ vii

Fed. R. Crim. P. 12 ........ 18, 22, 36, 37, 40

Fed. R. Crim. P. 14 ........ 48

Fed. R. Crim. P. 29 ........ 45

Fed. R. Crim. P. 44 ........ 8

Fed. R. Crim. P. 51 ........ 44

Fed. R. Evid. 404 ........ 19, 55

## Statement of Related Cases

Kimberley Tew was tried with her co-defendant and husband Michael Tew. His appeal is pending before this court in case number 24-1465.

## Jurisdictional Statement

The district court had jurisdiction under 18 U.S.C. § 3231 and entered final judgment on August 13, 2024. III:1288. Tew timely filed a notice of appeal seven days later. II:1283. This court has jurisdiction under 28 U.S.C. § 1291.[1]

[1] This brief cites to the record on appeal by volume and page number: *e.g.*, "I:13" refers to volume I, page 13. Citations to the supplemental volumes are preceded by an "S": *e.g.*, "S-I:13."

## Statement of the Issues

Kimberley Tew and her husband, Michael Tew, conspired to defraud a company called National Air Cargo of some $5 million. The Tews were charged with numerous federal crimes and initially insisted on joint representation even though the district court warned them that their defenses might clash. Kimberley filed a pretrial severance motion but did not raise antagonistic defenses as a basis. The district court denied both that motion and Kimberley's challenge to a search warrant for her Apple ID account. The Tews then asked for and were granted separate counsel and went to trial.

On the second day of trial, Kimberley asked to supplement the record on severance and raised antagonistic defenses for the first time. The district court thanked her for supplementing the record but otherwise did not pass upon the issue. The Tews blamed each other for the fraud at trial. But both were convicted.

I. Was the search warrant for Kimberley's Apple ID account sufficiently particular when it was limited to specific offenses, a date range, and a particular conspiracy? If not, does the good-faith exception spare the evidence from exclusion?

II. Should this court review Kimberley's antagonistic-defenses severance claim when she did not raise it before trial and supplemented the record during trial without seeking a ruling? If the court reviews the claim, did the district court abuse its discretion in holding a joint trial for members of the same conspiracy?

## STATEMENT OF THE CASE

### I. The Tews defraud National Air Cargo of more than $5 million.

National Air Cargo transported cargo and sometimes people for the Department of Defense and other companies. S-I:824-25. The company hired Michael Tew as a contractor and later made him its chief-financial officer. S-I:829-30, 837. National also contracted with Michael's wife, Kimberley Tew, for consulting work. S-I:205, 835.

In 2018, National fired Michael. S-I:861. The company did so because it learned that his corporate credit card had been used at grocery and retail stores. S-I:854. Michael blamed Kimberley. She had taken the card and bought gift cards from the stores, which she used to buy Bitcoin. S-I:276, 854. Also contributing to National's decision was an attempt to blackmail its chief-executive officer by someone who said the Tews owed him money. S-I:859-60.

Jonathan Yioulos also worked at National, in accounting. S-I:196. His responsibilities included paying invoices submitted to the company. S-I:207. Yioulos considered Michael a "friend." S-I:201. One day, Michael told Yioulos that "he was in a jam" and needed money. S-I:270. Michael asked if Yioulos could help. S-I:271. When Yioulos said no, Michael sent a fake invoice and said, "just pay this." S-I:271.

So began a conspiracy that lasted from August 2018 to July 2020 and cost National more than $5 million. S-VI:129. In short, Michael sent Yioulos invoices for work never performed. S-I:200. Yioulos paid the invoices. S-I:200. Kimberley coordinated with Michael and exhorted Yioulos to pay the invoices. S-I:201.

To conceal their participation, the Tews submitted invoices on behalf of numerous entities. For example, they submitted invoices in the misspelled name of one of Kimberley's friends without her knowledge. S-I:726-27; S-XVI:53. They chose that friend because she suffered from drug addiction that would make her a "convenient scapegoat." III:1182. Michael also created companies called "Global Fuel Logistics" and "Aero Maintenance Resources." S-I:423, 440. Given National's business, these companies were more plausible

vendors than, say, "Political Media" (another entity for which the Tews had submitted invoices earlier in the conspiracy). S-I:677-79.

The Tews maintained numerous accounts at numerous banks. S-VI:126-29. They transferred payments from National between these accounts and withdrew large amounts of cash. S-I:782, 1304-05. They used more than $2.4 million of that cash to buy Bitcoin. S-I:1532, 1554. The Tews insisted that they needed the money to pay back various debts and cover Kimberley's gambling losses. S-I:201-02. The Tews shared an apartment in an upscale Denver neighborhood. S-I:1171. And their expenses included a new Audi and shoes that cost close to a thousand dollars. S-I:1605, 1704.

The Tews texted each other throughout. For example, Kimberley messaged Michael, "I really, really don't want to stress you out, but we're going to need more money … Can he send another to arrive Monday?" S-I:1495. Michael replied, "I doubt it. I'll see. I guess we're fucked." S-I:1495. One time, when Yioulos did not answer Michael, Kimberley texted, "fuck him and his midlife crisis. If he doesn't call you within the next 20 minutes, I will personally turn him in. Fuck it." S-I:1493. That they might get caught was not lost on

the Tews. Kimberley told Michael, “I would turn myself in and negotiate immunity for you, so our kids have a shot.” S-I:1458-59.

For his part, Yioulos received Bitcoin from the Tews worth $100,000 or so. S-I:213. Sometimes, the Tews dangled carrots to convince him to pay the invoices. For instance, Michael offered him Buffalo Bills tickets, and both Tews talked about paying off his student loans (they did not). S-I:254. Other times, they wielded the stick. Kimberley warned, “We have not received any of this money and Michael doesn’t have a job. You should take this seriously, because you could lose your license if he reports you.” S-I:267.

Yioulos dealt primarily with Michael. S-I:210. Kimberley typically stepped in when Yioulos said he could not pay the invoices. S-I:210. His interactions with her were “not pleasant.” S-I:210. To take just a couple examples, Kimberley texted Yioulos, “You asshole, fuck you for talking to my husband like this” and “I swear to God you will regret it. Fuck you call and apologize to him.” S-I:261, 264.

## II. The Tews are charged with numerous federal crimes. The district court warns them about antagonistic defenses but permits joint representation.

Federal agents investigated National and uncovered the conspiracy. S-I:996-1000. National fired Yioulos on July 7, 2020. S-I:467-68. When Yioulos left the office for the last time, agents were waiting for him. S-I:468. He agreed to speak with them and make a recorded call to Michael at the agents' direction. S-I:469-71.

The next day, Michael was arrested on a complaint. I:89. He agreed to cooperate and sat down for a proffer a week later. III:445. At this first proffer, the government agreed that Michael did not have to answer questions that implicated his wife. I:1334. When Michael agreed to sit down for second proffer a couple weeks later, he agreed to answer questions about his wife. I:1338; III:626. Kimberley eventually sat down for a proffer herself. III:793.

Michael also agreed—without Kimberley's knowledge—to meet agents so that they could image his phone. III:1186. Kimberley showed up and berated Michael. III:1186.

Michael initially agreed to plead guilty to an information pre-indictment. I:90, 92. He soon expressed dissatisfaction with his

counsel and the content of the plea agreement. I:100. Still, he insisted that he was "willing to plead and cooperate." I:100. But that soon changed. Michael withdrew his notice of disposition. I:103. His then-counsel withdrew as well. I:98.

Then came an indictment charging Michael, Kimberley, and Yioulos. I:104. All three were charged with conspiracy to commit wire fraud and numerous counts of wire fraud. I:106-119. The Tews were also charged with conspiracy to commit money laundering and multiple counts of money laundering. I:119-24.

Kimberley was specifically charged with:

- **Count 1**: Conspiracy to commit wire fraud. 18 U.S.C. § 1349.
- **Counts 16, 21, 22, 25, 26, 31, and 32**: Wire fraud and aiding and abetting. 18 U.S.C. §§ 2, 1343.
- **Count 41**: Conspiracy to commit money laundering. 18 U.S.C. § 1956(h).
- **Counts 44, 47, 48, and 56**: Money laundering. 18 U.S.C. § 1957.

New counsel entered on behalf of Michael *and* Kimberley. I:160. The government moved for an inquiry regarding the propriety

of joint representation. I:161; Fed. R. Crim. P. 44(c)(2) ("The court must promptly inquire about the propriety of joint representation…). The government explained that, while the Tews may "agree about their defenses now," that might well change. I:167.

The district court held a hearing. It advised the Tews that, "The best defense for one defendant sometimes can be to say, while the other defendants were guilty, I didn't do it," and that counsel representing multiple co-defendants "can't effectively make that sort of argument." V:321-22.

The Tews' counsel responded, "I think the stronger defense, without saying more, is they stand as husband and wife." V:323. Counsel added, "I'm confident that we can move forward with a strong defense with this married couple who love each other and without these conflicts arising." V:323. Counsel also contrasted his approach with that of Michael's prior counsel: "I think my approach to the defense is different and is, you know, based on their strong love and unity and telling the story of what actually happened here instead of them being splintered and forced to turn against each

other and destroy this family or whatever. I have a different approach to defense than prior counsel." V:325.

The government still had concerns. It pointed out that the Tews had each sat down for proffers and "separately provided information that inculpate[s] the other." V:327. The government also noted that, while "right now there is an all for one, one for all defense," counsel's options were limited by his joint representation. V:329. And there was "an inevitability" of conflict given that the Tews had already "taken different positions at various points in time." V:329.

The district court found that that Tews' knowingly and voluntarily waived any present or future conflicts and permitted joint representation. V:334.

Meanwhile, Yioulos pleaded guilty to conspiracy to commit wire fraud and one count of wire fraud. I:226.

## III. The district court denies Kimberley's pretrial suppression and severance motions. The Tews ask for and receive separate counsel.

The Tews' counsel withdrew, in part because the couple could not honor their financial obligations. I:259, 276. New counsel entered, again on behalf of both Tews. I:289.

### A. The court denies the Kimberley's suppression motion.

The Tews moved to suppress electronic information seized under numerous warrants. III:91. One warrant concerned Kimberley's Apple ID account (kley@me.com). III:107.

The warrant's Attachment B was divided in two sections. Section I set forth the information to be disclosed by Apple and was not restricted to specific offenses. III:198. The warrant authorized the government to review the information disclosed under Section I. III:200. Section II then authorized the government to seize any such information that constituted fruits, evidence, or instrumentalities of certain target offenses from May 1, 2018, to the present, including certain specific categories subject to seizure. III:199.

Kimberley challenged the warrant on various grounds. III:107-12. One was that the warrant lacked particularity because it authorized the seizure of information regardless of whether it was "related to the offenses" under investigation. III:111-12.

The government responded that the warrant set forth a two-step process. I:365. While Kimberley was correct that the information to be *disclosed* under Section I was not limited to the

target offenses, the information to be *seized* under Section II was and further restricted by a date range. I:372-74. Kimberley's particularity argument concerned only Section I and accordingly failed because that section did not define the information to be seized. I:365-72.

The district court denied the suppression motion. It held that the Apple ID warrant was limited "to evidence related to specific statutes and to a specific scheme against the named victim company" and to a specific time frame. I:698. In any case, the good-faith exception spared the evidence from exclusion. I:699.

### B. The court denies Kimberley's severance motion.

Kimberley—but not Michael—moved for pretrial severance on two grounds. I:467. First, she argued that Michael had made statements that "incriminated" her, and she would not have the opportunity to confront him in a joint trial in violation of *Bruton v. United States*, 391 U.S. 123 (1968). I:468. Second, she argued that she would be harmed in a joint trial by the "sheer number of counts" Michael faced compared to her and the "special prejudice that arises from the joint trial involving a husband and wife." I:470-71.

At a hearing on the motion, the government pointed out that joint representation, not a joint trial, threatened to prejudice the Tews. IV:130. The district court agreed that joint representation was "risky" and urged the Tews to "really think through" the matter. IV:131. Again, the court did not require separate counsel. IV:131.

The court then denied the severance motion. I:678. The potential *Bruton* statements were the recorded phone call between Michael and Yioulos, along with Michael's proffer statements. I:680. The phone call was not testimonial and could be redacted to avoid any problematic references to Kimberley. I:681-82. And although the proffer statements were testimonial, they could only come in if Michael breached the proffer agreement and could be redacted as well. I:682-83. The court further held that Kimberley had not shown any other prejudice to merit severance. I:683-85.

### C. The Tews ask for and receive separate counsel.

The Tews eventually moved for separate counsel. I:740. They asserted that they were "considering and will continue to consider that one or both of them may elect to testify on their behalf" and that they had both made proffer statements that "incriminate both" of

them. I:742. The district court granted the motion. I:744. Kimberley and Michael each received new counsel. I:746, 773. That prompted another continuance of the trial by nearly a year. I:815.

Before trial, the parties litigated the admissibility of statements made in furtherance of the conspiracy. I:1270. The government submitted a *James* log that contained 376 entries and previewed the statements the government might admit at trial. I:847-1148; *see United States v. James*, 590 F.2d 575 (5th Cir. 1979). The district court also held a *James* hearing. S-I:1.

## IV. The Tews are convicted. During trial, Kimberley "supplements the record" on severance.

The Tews' trial began on February 5, 2024, nearly three years to the day after they were indicted and nearly four years after Michael was first arrested. S-I:141.

**Monday.** In her opening statement, Kimberley urged the jury not to "lump" her together with Michael and argued that the only conspiracy was between him and Yioulos. S-I:184; *see also* S-I:188.

That prompted Michael to move for severance based on antagonistic defenses. His counsel found it "very odd" that the Tews' prior counsel moved "to sever for one defendant based on *Bruton*, but

not antagonistic defenses, however, here we are." S-I:190. Michael argued that Kimberley's opening "point[ed] the fingers" at him and Yioulos. S-I:190. Kimberley did not join the motion and stated her "intention to defend the case exactly as we opened." S-I:190.

The government responded that the issue should have been raised much earlier. S-I:191. The district court agreed that Kimberley's defense did not "seem like some surprise bombshell." S-I:193. Yet the court took the motion under advisement (to "think about it a little more") and gave the parties the opportunity to file briefs on the issue by midnight on Wednesday S-I:193-94.

The government then called its first witness: Yioulos. S-I:196.

**Tuesday.** The next morning, the district court voiced its skepticism about Michael's severance motion but said, "you certainly can file things tomorrow, as I originally ordered." S-I:248-49.

Yioulos continued his testimony. At one point, Kimberley's counsel objected that introduction of the recorded phone call between Yioulos and Michael would present *Bruton* issues. S-I:351-53.

Given that this issue had been raised in Kimberley's pretrial severance motion, and could have been raised again at the *James*

hearing, the government responded that the defense was "waiting until the very last minute to raise all of these arguments." S-I:353. Although the court had already held that the statements on the phone call were not testimonial, I:680, it nonetheless wanted to "look at some of these cases" and "get a little more comfortable." S-I:354.

The *Bruton* issue came up again at the end of the day when Kimberley argued that Michael's statements were not in furtherance of the conspiracy, S-I:483, another issue that could have been raised at the *James* hearing. She then argued that there were "grounds to move for severance, which we did not do yesterday, based on opening statements, but which we would do now." S-I:483. The district court decided to "look it over again tonight." S-I:483.

**Wednesday.** The next day saw Yioulos face cross-examination. Michael had the first crack. S-I:514. He attacked Yioulos at length about the statements he made to agents right after he was fired. S-I:529. For example, counsel asked, "Do you recall telling agents, on July 7, 2020, that quote, 'It's almost like this one woman had us both by the balls, and … we were both kind of helpless?'" S-I:633. Counsel also asked, "When you were speaking with agents that day … did you

tell them, quote, 'Truthfully, I think it's Kimberley's drive to do all this?'" S-I:538. Kimberley did not object to either question. After Michael had finished, Kimberley crossed Yioulos. S-I:637.

At the end of the day, Michael's counsel if she could file his severance motion the next day instead of by midnight. S-I:691. The court responded that it would like to see the motion the next morning and that it would "probably spend time over the weekend considering that, so it's not a big rush." S-I:692.

**Thursday**. Morning came and went without a written severance motion from Michael.

But Kimberley's counsel wanted to "supplement the record" on severance. She noted that Michael's cross-examination of Yioulos had made Kimberley out to be the "mastermind behind this," which was in "direct conflict" with her defense. S-I:697. Counsel concluded, "I just wanted to make that record on severance." S-I:697.

The district court responded, "Thank you for supplementing the record." S-I:699. The court added, "I thought the plan was to file something on the severance thing by this morning. Was that—I don't know that anyone has done that. Has anyone done anything?" S-

I:699. Michael's counsel responded that she was "overly ambitious" and asked to "file by some point today." S-I:699. The district court again aired its skepticism about severance but said, "I don't want to argue about it now. I will just let you know where I stand, and so when you do file your written responses, you can understand what I think are the most difficult hurdles for you to overcome." S-I:705.

Later that day, Michael filed a written severance motion. II:729. Kimberley filed nothing.

**Friday**. The court asked the government to respond to Michael's severance motion by noon on Sunday and said that it would resolve the motion on Monday. S-I:955.

At the end of the day, Kimberley moved for a mistrial. First, she argued that the government had elicited improper "victim impact testimony." S-I:1150. Second, she argued that the government and Michael had made her out to be a "mystical woman who has the ability to control what everyone around her does," so there was a risk the jury would convict her "because they don't like her." S-I:1152. The district court denied the motion without prejudice. S-I:1155.

**Monday**. The government responded to Michael's severance motion. II:765. First thing Monday, the district court orally denied the motion and previewed a written order to follow. S-I:1160.

The written order came later that day. II:785. The court observed that, "during trial," Michael had "orally moved for severance, followed by a written motion." II:785. The court did not mention any midtrial severance motion on Kimberley's part.

The court first held that the motion was untimely. A severance motion must be filed before trial so long as "the basis for the motion is then reasonably available." Fed. R. Crim. P. 12(b)(3)(D). Here, there was a "real, foreseeable possibility" of antagonistic defenses that had existed for "years." II:788. Indeed, the government had raised the very possibility from the start. I:788. There were also "multiple natural opportunities" to raise the issue before trial, not least when the Tews were given separate counsel. II:788.

The court also held that Michael's severance claim failed on the merits. II:789. First, the supposed conflict between the Tews' defenses amounted to mere "finger-pointing," which was not enough. II:790. Second, Michael "had not identified a specific trial right" that

would be compromised by the joint trial, and a limiting instruction could cure any prejudice. II:791. Third, any prejudice was outweighed by concerns about judicial economy and expedition. The case had "been ongoing for nearly four years" largely due to delays requested by the Tews. II:792. In fact, the Tews had tried to delay the trial even "after it started" through such gambits as the "re-litigation of many issues resolved prior to trial." II:792.

**The rest of trial**. The trial proceeded. After the government rested, both Kimberley and Michael moved for judgments of acquittal. S-I:1711-12. Kimberley offered "[n]o argument" on the motion. S-I:1711. Michael offered little beyond an assertion that the government had not "sustained its burden." S-I:1712.

Michael's counsel then moved to "renew all objections made during trial," along with his severance motion, and all objections under Rule 404(b), "just so the record is preserved." S-I:1712. That prompted Kimberley's counsel to chime in, "One more thing, just again, for purposes of the record, since the government's case is officially closed, we have an obligation to renew or [sic] motion to

severe [sic].” S-I:1712. The district court denied the acquittal motions and “noted” the other objections. S-I:1712, 1713.

Neither Michael nor Kimberley introduced evidence in their defense. After closings—indeed, after the jury had been sent to deliberate—Kimberley’s counsel moved to “renew and supplement” her mistrial motion. S-I:1792. She argued that “pretty much every lay witness” had testified to inadmissible matters. S-I:1792.

The district court asked Michael’s counsel if she wanted to weigh in. “Just really quickly,” she wanted to, again, “renew, for the record” her acquittal and severance motions. S-I:1797. She took “no position” on Kimberley’s mistrial motion or any other objections. S-I:1797. That prompted Kimberley’s counsel to “join” the acquittal motion “at the end of the case also and the severance.” S-I:1798

The district court denied “all of those motions” but thought “they are properly preserved.” S-I:1798. On severance, the court observed, “obviously, I have given a written ruling.” S-I:1798.

**The verdict and sentence.** The Tews were found guilty across the board. II:923-47. Kimberley was specifically found guilty of conspiracy to commit wire fraud, multiple counts of wire fraud,

conspiracy to commit money laundering, and multiple counts of money laundering. II:924, 931, 933, 935, 936, 939, 940, 941, 942, 943, 946. The district court sentenced her to 48 months. II:1282.[2]

## SUMMARY OF ARGUMENT

**I.** The search warrant for Kimberley's Apple ID account passed constitutional muster. This court has held that an electronic search warrant must contain limiting principles to satisfy the Fourth Amendment's particularity requirement. And the warrant here contained numerous ones. First, it was limited to specific target offenses. Second, it was limited to a date range tied to the conspiracy. Third, it was limited—both through the warrant's own language and its incorporated and attached affidavit—to evidence of the conspiracy to defraud National and launder the proceeds.

Even if the warrant fell short, the good-faith exception to the exclusionary rule saves the evidence from exclusion. That is because here is no hint of misconduct to deter. The agent who obtained the warrant tried to comply with the law and sought the assistance of a

---

[2] Although Kimberly was charged with wire fraud in Count 16, I:114, that was a mistake, and the district court did not include her name on that count on the verdict form, S-I:1655.

prosecutor. And there is no evidence that the agent who executed the warrant searched for anything other than evidence related to the conspiracy for which there was undisputedly probable cause.

**II.** This court should not review Tew's severance claim based on antagonistic defenses. Severance is among the claims that must be raised before trial so long as the claim's basis is reasonably available. Fed. R. Crim. P. 12(b)(3)(D).

Kimberley never moved for severance based on antagonistic defenses before trial. Yet from the start the district court warned the Tews that their defenses would likely clash. And if the couple turned a blind eye to that warning while their strong "love and unity" bound them to the same counsel and a unified defense, they could not have ignored it once they received separate counsel still well before trial. Plus, Kimberley knew about the specific statements that ultimately formed the basis of her claim when they were elicited at trial. She accordingly has no excuse for not raising that claim before trial.

Kimberley's efforts to raise the issue during trial were inadequate as well. She says her claim was based on Michael's cross-examination of Yioulos. But she did not raise the issue during that

examination or even immediately after. She waited until next day after she had finished her own cross-examination of the witness. Not just that, when Kimberley did raise the issue, she did not ask for severance but just sought to "supplement the record." And the district court never actually passed upon the issue.

Regardless, the district court did not abuse its discretion in holding a joint trial for members of the same conspiracy. Tew's assertion of antagonism amount to the sort of finger pointing among defendants that is not enough. Moreover, Tew has not identified any specific trial rights that were compromised because of the joint trial. While she laments the admission of evidence that painted her in a bad light, she did not object to that evidence and has not shown that its admissibility turned on the joint nature of the trial. Besides, any prejudice was outweighed by concerns about economy and expedition. Kimberley asked for severance in the middle of a trial where numerous out-of-state witnesses had already flown in to testify and which had been pending for years on account of delays the Tews requested.

## ARGUMENT

### I. The Apple ID warrant was sufficiently particular. The good-faith exception applies in any event.

**Preservation:** Tew claims on appeal that the warrant for her Apple ID account was insufficiently particular. But she did not raise below the same particularity claim she raises now. Even so, because the district court passed upon the issue she now raises, this court reviews her claim as if it were preserved.

As noted, Attachment B of the warrant was divided into two sections: Section I specified the information to be disclosed by Apple. Section II specified the information to be seized by the government (after review of the information disclosed in Section I) and was confined to certain target offenses cited by statute. III:171-73.

Below, Tew claimed that the warrant was insufficiently particular because Section I permitted Apple to disclose categories of information "regardless of whether they are related to" the target offenses. III:112. Now, in contrast, Tew claims that the warrant is insufficiently particular because the target offenses in Section II are themselves inadequate limits. Op. Br. 25 ("confining a search to violations of such statutes 'places no real limitation on the warrant'")

(citation omitted). Because Tew's particularity argument below was "substantively different than the particularity argument" she now advances, she did not preserve the claim. *United States v. Stein*, 819 F. App'x 666, 672 (10th Cir. 2020) (unpublished).

Still, when a district court "passes upon" an issue, an appellant may challenge the ruling on appeal as if it were preserved even if it was not. *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 992 (10th Cir. 2019); *see also United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003). A district court passes upon an issue when it applies "the relevant law to the relevant facts." *Tesone*, 942 F.3d at 992 (citation omitted).

The district court passed upon Tew's appellate issue when it deemed the warrant sufficiently particular because it was "limited to evidence related to specific statutes," a date range, and a specific conspiracy to defraud National and launder the proceeds. I:698.

**Standard of review:** This court reviews the district court's factual findings for clear error and views the evidence in the light most favorable to the government. *United States v. Palms*, 21 F.4th

689, 697 (10th Cir. 2021). The court reviews de novo the "ultimate question of reasonableness under the Fourth Amendment." *Id.*

**Argument**: The Fourth Amendment requires that a search warrant be supported by probable cause and describe with particularity the place to be searched and the evidence to be seized. U.S. Const. Amend. IV; *Palms*, 21 F.4th at 697. Under the good-faith exception to the exclusionary rule, evidence seized under an overbroad warrant should not be suppressed if an agent relied in objective and reasonable good faith on the warrant. *United States v. Burgess*, 576 F.3d 1078, 1095 (10th Cir. 2009). The warrant here was sufficiently particular. Even if not, the good-faith exception applies.

**A. The warrant was sufficiently particular.**

To satisfy the particularity requirement, an electronic search warrant must contain "some 'limiting principles.'" *United States v. Salas*, 106 F.4th 1050, 1057 (10th Cir. 2024) (citation omitted). A warrant with none falls short. *Id.* It is typically enough that the warrant "affirmatively limit[s] the search to evidence of specific federal crimes or specific types of material." *Id.* (cleaned up).

Here, Attachment B listed several categories subject to seizure. That list was subject to the general limitation that seizure extended only to "fruits, evidence, and/or instrumentalities of violations" of certain target offenses "since May 1, 2018." The target offenses were: 18 U.S.C. §§ 371 (conspiracy to commit an offense against the United States), 1343 (wire fraud), 1349 (attempt and conspiracy to commit wire fraud), 1519 (destruction, alteration, or falsification of records in federal investigations), 1956 (money laundering), and 1957 (money laundering). III:199. One category listed in Attachment B was:

> a. All information, including records, documents, communications, and photographs, regarding violations of the Target Offenses, including information about the planning, motive for, preparation, execution, amendment, concealment, and furtherance of a conspiracy or scheme to defraud National Air Cargo, planning, discussion, motive for, execution, amendment, concealment, and furtherance of a conspiracy to commit money laundering or substantive acts of money laundering, whether through fiat currency or cryptocurrency, and about or showing planning, or concealing the destruction of records or evidence related to the Target Offenses;

III:199.

A number of limiting principles emerge from the warrant.

First, the warrant limited the search and seizure to certain target offenses cited by statute. The warrant did not even need to

“identify specific statutes for the crimes to which” it was limited. *Palms*, 21 F.4th at 698. But it did.

Second, the warrant was limited to a date range—“since May 1, 2018”—tied to the probable cause that supported the warrant. The affidavit in support of the warrant said that the “fraud began” while Michael was still employed at National and noted that he submitted fraudulent invoices as early as “the summer of 2018.” III:177.

Third, the warrant guided executing agents to seize evidence related to the specific conspiracy to defraud National. One way the warrant did so was by directing agents to seize evidence “including information about the planning, motive for, preparation, execution, amendment, concealment, and furtherance of a conspiracy or scheme to defraud National” and launder the proceeds. III:172.

Another way the warrant did so was through its affidavit. An attached and incorporated affidavit can particularize a warrant when together they “adequately describe the criminal activity under investigation.” *United States v. Gaye*, 130 F.4th 865, 873 (10th Cir. 2025) (cleaned up). The warrant packet here noted that the search was based on “the attached affidavit, which is incorporated by

reference." III:169. The affidavit in turn described the specific conspiracy to defraud National and launder the proceeds. III:177-89. Hence the affidavit "flesh[ed] out how the conduct being investigated is related to the statutes listed" and particularized the warrant. *United States v. Cooper*, 654 F.3d 1104, 1126 (10th Cir. 2011). *Cooper* also recognized that particularity turns "the nature of the crimes being investigated" and the "complex and comprehensive" financial crimes there demanded less specificity. *Id.* at 1127. So too here.

Tew's main line of attack on the warrant is that its target offenses were too broad to particularize it. Op. Br. 26. In support, she cites *Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985), and *United States v. Leary*, 846 F.2d 592 (10th Cir. 1988).

*Voss* held that a warrant authorizing the seizure of "books, records, or documents" was insufficiently particular even if limited to evidence related to violations of the general conspiracy statute, 18 U.S.C. § 371. 774 F.2d at 404, 405. That limitation was "no real limitation" at all because the general conspiracy statute bars "conspiracies to violate any federal statute." *Id.* at 405.

*Leary* similarly held that a warrant authorizing the seizure of "business records typical of the documents kept by an export company" was insufficiently particular even if limited to evidence related to violations of the federal export laws. 846 F.2d at 600-01. Those laws "cover[ed] a broad range of activity" and therefore were inadequate to particularize the warrant. *Id.* at 601.

The warrant here is distinguishable. First of all, neither the *Voss* nor *Leary* warrants incorporated an attached affidavit that cures any putative defect. 774 F.2d at 403-04; 846 F.2d at 603-04.

Plus, the warrant here is distinguishable on its own terms. True, it lists the general conspiracy statute like the *Voss* warrant. But where the *Voss* warrant listed only that statute, the warrant here lists the statute among several others. Thus, under a "practical and commonsense" reading, *United States v. Suggs*, 998 F.3d 1125, 1133 (10th Cir. 2021), the warrant here was limited to conspiracies to violate the other listed statutes and did not extend to conspiracies to violate any federal statute as in *Voss*.

Nor were the other target offenses (wire fraud, money laundering, and destruction of records) themselves too broad. To

illustrate, this court has held sufficiently particular warrants that authorized the seizure of documents broadly "relating to firearms transactions" or those "related to drug transactions." *United States v. Le*, 173 F.3d 1258, 1275 (10th Cir. 1999).

Granted, other circuits have deemed insufficiently particular warrants broadly authorizing seizure of documents that constitute evidence of mail or wire fraud. *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990); *United States v. Roche*, 614 F.2d 6, 7-8 (1st Cir. 1980). Even so, the warrant here was further particularized by its additional limits to a date range and specific conspiracy.

Tew's responses on these two additional limits fall short.

On the date range, Tew says that the warrant permitted seizure of a "*huge* amount" of information and gave agents a "window into virtually every aspect of [her] personal life." Op. Br. 27. But the amount of information seized was commensurate with the extent of the conspiracy. Tew's further complaint that agents came across irrelevant information is better directed to the scope of the search. *Salas*, 106 F.4th at 1059-60. In terms of scope, agents could look anywhere evidence might reasonably be found, and here there was

"no practical substitute for" searching parts of the account where personal information might also lie. *Burgess*, 576 F.3d at 1094. That "some irrelevant information was viewed resulted more from the ease of electronically storing (and hiding) vast amounts of invisible information" than any defect in the warrant itself. *United States v. Otero*, 563 F.3d 1127, 1135-36 (10th Cir. 2009).

Tew next contends that the warrant here was not limited to a particular conspiracy because the word "including" appears before the specification of information related to that conspiracy. Op. Br. 26. Again, however, this court construes warrants in a "practical and commonsense fashion," not a "hypertechnical" one. *Suggs*, 998 F.3d at 1133. True to that principle, this court has discerned limits from similarly inclusive language before.

Take *United States v. Lamport*, 787 F.2d 474, 476 (10th Cir. 1986), which read the language "any other property that constitutes evidence of the commission of the criminal offense" to be limited by the "specific items listed" preceding the language.

Similarly, while some of the categories subject to seizure in *United States v. Wagner*, 951 F.3d 1232, 1248 (10th Cir. 2020)

(cleaned up), "did not reference a specific subject matter," when "read in context," the warrant "contained sufficiently particularized language requiring a nexus with child pornography."

And *Salas* read a term permitting seizure of evidence "to show the use and delivery of a controlled substance; to include … *records, and/or receipts, written or electronically stored*" to permit seizure of only "specific kinds of digital evidence," that is, "records and/or receipts, written or electronically stored" notwithstanding the preceding "to include" language. 106 F.4th at 1058.

**B. The good-faith exception applies.**

The exclusionary rule does not require suppression of evidence obtained under an insufficiently particular warrant if an agent relied on the warrant in objective and reasonable good faith. *United States v. Russian*, 848 F.3d 1239, 1246 (10th Cir. 2017).

The "rationale" for this good-faith exception is that the "purpose of the exclusionary rule" is to deter misconduct, and when an agent "acts in good faith, there is nothing to deter." *Russian*, 848 F.3d at 1246. Still, the agent's reliance on the warrant "must be objectively reasonable," so the exception does not apply when a

warrant is "so facially deficient" that an agent could not have reasonably thought it was valid. *Id.* (cleaned up).

The good-faith exception applies here because here is no misconduct to deter and the warrant was not so facially deficient that a reasonable agent could not have thought it valid.

To start, the agent "made every effort to comply with the law." *Russian*, 848 F.3d at 1247 (cleaned up). This court had held that an electronic search warrant was sufficiently particular if limited to "evidence of specific federal crimes." *Palms*, 21 F.4th at 698. The agent here not only tried to comply with that principle but also added additional limits in the date range and specification of a particular conspiracy. The agent also "sought the assistance" of a prosecutor, *Otero*, 563 F.3d at 1134, who reviewed the warrant herself, III:194.

Moreover, an affidavit "can support a finding of good faith, particularly where" the agent who prepared the affidavit "also executed the search." *Russian*, 848 F.3d at 1246. That is because the preparing agent is aware of the affidavit's limits. *Id.* The affidavit here detailed the conspiracy under investigation. IRS Special Agent Lisa Palmer executed the warrant. I:387; S-I:1444. And although she

did not prepare the affidavit for this warrant, she prepared numerous affidavits for other electronic warrants that detailed the same conspiracy. III:253-59, 273-80, 305-312. That is, she knew what she was supposed to be looking for.

And there is no indication that she strayed from that understanding. *Russian*, 848 F.3d at 1247. Palmer initially "conducted a very focused review to determine whether specific communications between the defendants or between the defendants and co-conspirators could be seized pursuant to the warrant." I:388. She came across communications that appeared to involve an attorney, immediately stopped, and notified prosecutors. I:388. That kicked off a separate filter process to protect the Tews' attorney-client privileges. I:388-409. This is hardly the sort of conduct that should be deterred through the exclusionary rule.

In response, Tew likens the warrant here to the sort of general warrant in *Cassady v. Goering*, 567 F.3d 628, 643 (10th Cir. 2009). But that warrant gave "unlimited authorization for search and seizure of all evidence of any criminal activity." *Id.* Not so here.

Tew also contends that *Voss* and *Leary* would have put a reasonable agent on notice that the warrant here fell short. Op. Br. 31-31. As explained, however, the warrant here was narrower in multiple respects. It had a date range. It listed different target offenses. It referenced a specific conspiracy. And it incorporated an attached affidavit detailing that conspiracy.

## II. Tew failed to preserve her severance claim. The district court did not abuse its discretion.

This court should not review Tew's severance claim because she did not preserve it below. Regardless, the district court did not err in holding a joint trial for members of the same conspiracy.

### A. Tew failed to preserve her severance claim.

Tew claims that she was entitled to severance based on antagonistic defenses. She failed to preserve this claim because she did not raise it before trial and inadequately raised it during trial. This court therefore should not review the claim.

#### *1. Tew failed to raise her severance claim before trial as required by Rule 12.*

A severance motion "must be raised by pretrial motion if the basis for the motion is then reasonably available." Fed. R. Crim. P. 12(b)(3)(D). The 2014 Advisory Committee notes recognize that

severance is the sort of claim that "generally will be available before trial" but that "in some cases, a party might not have access to the information needed to raise" the claim. If the motion's basis is reasonably available and the party misses the pretrial deadline, "the motion is untimely." Fed. R. Crim. P. 12(c)(3). But the court may still consider the request "if the party shows good cause." *Id.*

Tew undisputedly did not raise a severance claim based on antagonistic defenses before trial. Her pretrial severance motion on different grounds did not preserve her current claim. *United States v. Herrera*, 51 F.4th 1226, 1269 (10th Cir. 2022). Thus, her claim was untimely unless its basis was not reasonably available before trial. The basis for the claim, again, is antagonistic defenses: Kimberley insists that she was "unaware and uninvolved with the conspiracy," while (in her view) Michael said she "masterminded it." Op. Br. 36.

This basis was reasonably available before trial. Kimberley was aware not only that Michael's defense likely would conflict with hers, but also the specific facts that ultimately supported her claim.

From the start—years before trial—the Tews were warned that their defenses would likely clash. The district court advised them at

their joint-representation hearing that "[t]he best defense for one defendant sometimes can be to say, while the other defendants were guilty, I didn't do it." V:321. The government reiterated the point in its motion for the hearing and at the hearing itself. I:167; V:329.

Not just that, at the hearing, the Tews' counsel admitted that Michael's prior counsel had *in fact* pursued an antagonistic defense. The Tews' then-counsel contrasted his approach, "based on their strong love and unity," with prior counsel's approach, based on "them being splintered and forced to turn against each other." V:325.

Then there are Michael's proffers, where he answered questions that inculpated Kimberley. I:1338; III:626. He also agreed at first to cooperate with the government, which could well have involved cooperation against Kimberley. I:100. For her part, Kimberley acknowledged in her pretrial severance motion on other grounds that Michael had "named and incriminated" her. I:468.

If not already available, the claim's basis came into even sharper focus once the Tews received separate counsel more than a year before trial. I:744. The "strong love and unity" that tied the Tews to a single counsel and single defense, V:325, gave way to the

inevitability that they would now turn on each other. Indeed, they asked for separate counsel precisely because they were considering testifying, which would implicate their statements incriminating each other during their "significant proffers." I:742. The Tews' new counsel had every opportunity to file a pretrial severance motion since the district court set a new pretrial motions deadline. I:815.

To top it all off, Kimberley was aware of the specific statements that she now marshals in support of her claim. She contends that the claim's basis emerged during Michael's cross-examination of Yioulos. Op. Br. 9. But just about every one of Yioulos's statements she now quotes came from his initial interview with agents. Op. Br. 9-13 ("did you say to agents?" "[d]o you recall telling agents?" "[w]hen you were speaking with agents that day…"). That interview was disclosed to the Tews before trial. S-I:521.[3]

[3] Tew's failure to properly raise her severance claim below deprived the government of the opportunity to create a complete record about how early the interview had been disclosed in discovery. But it is evident from the trial, not least Michael's attempt to admit a recording of the interview, S-I:521, that the interview had been disclosed before trial. Tew cannot in good faith claim otherwise.

Tew responds that she had "no notice" that Michael would pursue this defense at trial. Op. Br. 34 n.6. But Rule 12 requires only that the claim's basis be reasonably available, which is the case when the party has "access to the information needed" to assert the claim. Fed. R. Crim. P. 12, 2014 Advisory Committee Notes. Tew had access to the Yioulos statements she now says compelled severance.

Nothing in Rule 12 permits a party to wait until trial to move for severance just because there exists some uncertainty about a co-defendant's trial strategy. That uncertainty will often exist as there is no specific pretrial obligation to disclose trial strategy. And if that uncertainty can excuse noncompliance with the pretrial-filing requirement, then Rule 12's exception will swallow its mandate.

As if to illustrate the point, this court has held that an antagonistic-defenses claim that (as will be seen) bears more than a passing resemblance to Kimberley's should have been raised before trial. *United States v. Jones*, 530 F.3d 1292, 1302 (10th Cir. 2008). Other defendants, as well, have been able to raise such claims before trial. *United States v. Pursley*, 474 F.3d 757, 761 (10th Cir. 2007).

Kimberley's own pretrial severance motion demonstrates that she could have raised her current claim before trial. She moved for severance on *Bruton* grounds even though she did not know what specific statements of Michael's the government would introduce at trial. I:468-69. She does not explain why her *Bruton* severance claim was reasonably available before trial but her antagonistic-defenses one was not. As the district court aptly observed in finding Michael's midtrial motion untimely, the Tews had "demonstrated little reluctance in raising more minor hypothetical issues prior to trial throughout the nearly four-year pendency of this case." II:789.

Even if developments at trial might have affected Tew's claim, that was no excuse for her to defer a severance motion. That was instead a reason for the district court to defer ruling on the motion or deny it without prejudice. Rule 12(d) allows a district court to "defer a ruling" on a pretrial motion for good cause. And that option would have comported with the district court's "continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States*, 362 U.S. 511, 516 (1960). Pretrial briefing would have at least enabled a more expeditious resolution during

trial compared to the rushed briefing and multiple days it took for the district court to decide whether to order separate trials while simultaneously proceeding with a joint one.[4]

*United States v. Dirden*, 38 F.3d 1131 (10th Cir. 1994), does not help Tew. *Dirden* noted that "the mere possibility of antagonistic defenses provides an inadequate basis for severing trials." *Id.* at 1141. But that Tew's claim might have failed on the merits before trial is no justification for her failure to raise it. And the "possibility" in *Dirden* was not that a co-defendant would raise a particular defense, but the possible inferences the jury could draw from the evidence. *Id.* ("Hypothetically, the jury could have reached numerous conclusions based on its consideration of the evidence.").

Thus, the basis for Tew's severance claim was reasonably available before trial, so her attempts to raise the issue during trial were untimely. On appeal, this court will not "review an untimely

[4] Another potential option: Had Kimberly filed a pretrial motion, the district court could have required Michael to proffer regarding his anticipated defenses. *Cf. United States v. Graham*, 663 F. App'x 622, 626 (10th Cir. 2016) (unpublished) ("It is not uncommon for defendants to be required to proffer evidence of their defense(s) in advance of trial.")

Rule 12" claim absent good cause. *United States v. Bowline*, 917 F.3d 1227, 1237 (10th Cir. 2019). Tew has not alleged any good cause, which means she has waived her claim. *Herrera*, 51 F.4th at 1271.

*2. Tew's attempts to raise her severance claim during trial were inadequate.*

Even if Tew did not have to raise her severance claim before trial, her attempts to do so during trial were inadequate. For one reason, she did not timely raise the issue. For another, she did not actually request severance. And for still another, she did not seek a ruling from the district court. All these defects result in forfeiture. Tew's further failure to address plain error spells waiver.

**a.** Forfeiture occurs not only when a party "completely fails to object but also when" the party "fails to make the timely assertion of a right." *United States v. Wardell*, 591 F.3d 1279, 1309-10 (10th Cir. 2009) (cleaned up). Kimberley's severance claim is based on Michael's cross-examination of Yioulos. S-I:696. Yet she did not raise the issue during or even immediately after. Instead, she plowed on with her own cross-examination of Yioulos and raised the issue for the first time the next day altogether. S-I:696.

**b.** Then, when she did raise the issue, Tew did not actually ask for severance. Rule 51(b) says that, for a party to preserve a claim of error, it must inform the court "of the action the party wishes the court to take." Tew did no such thing. When her counsel raised the issue, she "wanted to just make that record." S-I:697. The district court responded, "Thank you for supplementing the record." S-I:699. Supplementation of the record is not a request for severance.

The district court evidently did not glean a severance motion from counsel's supplementation of the record. The court "thought the plan was to file something on the severance thing," S-I:699, and then said, "I don't want to argue about it now. I will just let you know where I stand, and so when you do file your written responses, you can understand what I think are the most difficult hurdles for you to overcome." S-I:705. Kimberley filed nothing.

Of course, Michael filed a written severance motion. And the the district court's order on his motion testifies to the absence of one for Kimberley. The court recognized that Michael had "orally moved for severance, followed by a written motion," II:787, but did not mention Kimberley's motion—because there was none.

Nothing else Tew said at trial adds up to an adequate severance motion. She says that she preserved her claim through her mistrial motion. Op. Br. 34 n.6. But though she moved for a mistrial in part because the evidence depicted her as a "mystical woman" in control of others, S-I:1152, the legal standards for mistrials and severance differ. For example, the mistrial standard does not balance any prejudice against the economy and speed of one trial. *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004).

Tew's other references to severance came too late and were too "perfunctory and underdeveloped" to preserve any claim. *United States v. Ansberry*, 976 F.3d 1108, 1125 (10th Cir. 2020) (citation omitted). Consider Tew's attempt to renew her severance motion at the close of the government's case, which was so perfunctory that it might well have referred to her pretrial motion on different grounds. S-I:1712. Just as perfunctory was her attempt to "join the Rule 29 at the end of the case and also the severance." S-I:1798.

It is immaterial that counsel made various references to "supplementation," "renewal," and the "record" throughout trial. These references were no substitute for a timely objection that

informed the court of the action counsel wished the court to take and they would have been unnecessary had counsel complied with those requirements.

**c.** Even if Tew moved for severance during trial, she failed to preserve her claim because she did not seek a ruling from the district court. "To preserve an issue for appeal, a party must alert the district court to the issue *and seek a ruling*." *United States v. Cates*, 73 F.4th 795, 809 (10th Cir. 2023) (cleaned up) (emphasis added).

One would struggle to find where in the record the district court ruled on Tew's supposed midtrial severance motion. The court did not do so when Tew first raised the issue. It merely thanked counsel for supplementing the record. S-I:699.

Tew replies that the court denied her supposed motion when she renewed it both at the close of the government's case and at the end of trial. Op. Br. 19. But to pass upon an issue a court must apply the law to the facts. *Tesone*, 942 F.3d at 992. That never happened here. The district court's "denial" at the end of the government's case was as perfunctory as Tew's renewal itself. S-I:1712. And while the court supplied more commentary at the end of trial, it seemed to be

talking about Michael's motion. S-I:1798 ("I think as to the motion for severance, obviously, I have given a written ruling.").

Tew's failure to seek a ruling impedes appellate review. With no ruling below, there is nothing to review on appeal. And the court should not review Kimberley's claim based on the district court's resolution of Michael's. This court does not appear to have resolved once and for all when one defendant may rely on another's preservation efforts. *United States v. Irving*, 665 F.3d 1184, 1206-07 (10th Cir. 2011). But if circumstances exist where this sort of vicarious preservation is appropriate, these are not them. Kimberley disavowed any intent to join Michael's claim. S-I:483. And she disregarded the district court's deadline for a written motion.

* * *

Tew thus failed to preserve her severance claim at trial. And her failure to argue plain error means that she has waived the claim. *United States v. Leffler*, 942 F.3d 1192, 1199-1200 (10th Cir. 2019). This court should not exercise its discretion to review it. Tew has pinned preservation on the premises that she did not have to raise the claim before trial and that her efforts during trial were enough.

Her failure to argue plain error, then, appears to be a "voluntary failure" and not "a product of mistake." *Id.* at 1199.

### B. The district court did not abuse its discretion in holding a joint trial.

**Standard of review:** This court reviews a preserved severance claim for an abuse of discretion. *Jones*, 530 F.3d at 1300.

**Argument:** When a joint trial "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

A "three-step inquiry" applies to determine whether severance based on antagonistic defenses among defendants is warranted. *Jones*, 530 F.3d at 1304. First, the defenses must be "'so antagonistic that they are mutually exclusive.'" *Id.* (citation omitted). Second, because mutually exclusive defenses "are not prejudicial *per se*," there must be a "serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt." *Id.* (cleaned up). Third, if the defendant satisfies the first two steps, the court must "weigh the prejudice" to

the defendant against "the obviously important considerations of economy and expedition in judicial administration." *Id.* (cleaned up).

Tew cannot "overcome the presumption that in a conspiracy trial it is preferred that persons charged together be tried together." *Jones*, 530 F.3d at 1302 (cleaned up). Her defense was not mutually exclusive with her husband's. She has not shown that the joint trial compromised any specific trial right or otherwise prejudiced her. And any prejudice was outweighed by concerns over economy and expedition that were especially substantial here.

*1. The Tews' defenses were not mutually exclusive.*

Defenses are mutually exclusive if the jury, "in order to believe the core of one defense, must necessarily disbelieve the core of the other." *Jones*, 530 F.3d at 1304 (cleaned up).

According to Kimberley, her defense was that she was unaware of the conspiracy; Michael's was that she was the mastermind. She argues that these defenses were mutually exclusive. Op. Br. 35.

Unfortunately for her, *Jones* defeats this assertion of mutual exclusivity. There, two defendants (Jones and Wright) were charged with bank fraud and conspiracy. 530 F.3d at 1296. The core of

Wright's defense was much like Kimberley's, "that the government's witnesses were lying and that he did not in fact commit bank fraud or enter into a conspiracy to do so." *Id.* at 1304. For her part, Jones "made some statements" about Wright similar to those Michael made about Kimberley, that Wright "orchestrated the bank fraud and even exercised some measure of control over [her]." *Id.*

While Jones's statements were antagonistic, they were "not so antagonistic" that "the two defenses were mutually exclusive." 530 F.3d at 1304. "Wright's guilt was not, in itself, a viable legal defense" for Jones nor "an indispensable component of her theory of the case." *Id.* To the contrary, Jones's lack-of-knowledge defense "did not necessarily depend" on Wright's guilt. *Id.*

Here too, Kimberley's guilt was not a viable legal defense for Michael nor indispensable to his defense that the government had not proven his guilt beyond a reasonable doubt. Unlikely maybe, but the jury could have "simultaneously believed" that both Tews were not guilty because Yioulos was lying and the rest of the government's evidence was false. *Jones*, 530 F.3d at 1304.

Kimberley tries to distinguish *Jones* because (in her view) Michael "did not deny committing fraud" and his defense was "that his wife controlled and manipulated him into doing so." Op. Br. 37.

But the record does not support Kimberley's retrospective characterization of Michael's defense. The core of his defense was that the government had not proven his guilt beyond a reasonable doubt. To illustrate, most of his closing was an attack on Yioulos's credibility. S-I:1750-61. He also emphasized the government's burden under the reasonable-doubt standard. S-I:1766-67. And while he also noted that Kimberley directed the fraud and was its sole beneficiary, he did so to minimize his culpability and in aid of his argument that the government had not proven his guilt. S-I:1762-66.

Michael never argued that Kimberley's manipulation and control somehow negated his guilt for a fraud he admittedly committed. He did not, for instance, advance any duress defense. And absent that sort of defense, Kimberley's manipulation and control could not have served as legal justification for fraud.

In fact, Michael could not have advanced any sort of coercion defense without violating his proffer agreement thereby triggering the admission of his (significant) incriminating proffer statements.

The Tews' proffer agreements generally barred the government from using their statements unless they breached the agreements. I:1325. In litigation over the admissibility of those statements, the district court held that "questioning a witness's credibility or perception of certain events, attacking the sufficiency of the evidence, or more generally claiming innocence" would not breach the agreements. II:601. But "making arguments that are known to be false" would "open the door" to "contradictory" statements. II:601.

The reality, then, is that Michael could not have advanced a coercion defense without opening the door to his incriminating proffer statements to the contrary where he took responsibility for the fraud. A few examples can stand in for many others. Michael admitted that he "needed the money," that he created the invoices, that he and Yioulos decided the payment amounts, and that he "was responsible … most every single time" for choosing the bank accounts where the payments were to be deposited. III:526, 531, 536, 543-44.

If Michael was not always clear about his theory of defense that was because he was caught between the need not to violate his proffer agreement and a landslide of damning evidence. Hence why his counsel resorted to abstractions about the "three elements of a forest fire" that were never really made concrete. S-I:181; *see also* S-I:1767. Also why his counsel offered no serious argument on his acquittal motion. S-I:1711-12. Still, the core of his defense was the only one he could advance without violating the agreement: that the government had not proven his guilt beyond a reasonable doubt.

The district court recognized as much when it denied Michael's midtrial severance bid. The court noted that Kimberley's core defenses were that "she did not know the details of the conspiracy as much" as Michael and Yioulos, that "the government cannot meet its burden to prove guilt beyond a reasonable doubt," and that "the government's witnesses lack credibility or are lying." II:791. These were "very similar" to Michael's core defenses and the "same" as those in *Jones*. II:791. *Jones* therefore resolves Tew's claim.

*2. A joint trial did not compromise any specific trial right or the jury's ability to reach a reliable verdict.*

Even if the Tews' defenses were mutually exclusive, Kimberley has not shown "a serious risk that a joint trial would compromise a specific trial right" or otherwise "prevent the jury from making a reliable determination about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). That risk might exist, for example, when "evidence that a jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant" *Id.*

Kimberley asserts that her trial rights were compromised because evidence of her "prior bad acts and manipulative character" was admitted at trial. Op. Br. 38.

The first problem for Tew is that she did not object to this evidence. Take Yioulos's statement, oft-quoted by Kimberley now, that she had him and Michael "by the balls." S-I:533. When Michael elicited this statement from Yioulos, Kimberley was silent. S-I:533. It is unclear how evidence that Kimberley did not even object to could have been so prejudicial as to compromise her trial rights.

The second problem is that Tew has not shown that any of this evidence came in *because* she was tried with her husband. The evidence she cites came in through Yioulos, who would have been available to testify in a separate trial. And the admissibility of this evidence did not turn on the joint nature of the trial.

When Tew belatedly raised concerns about this evidence, she did so because of the emotional response it would provoke in the jury or under Rule 404(b). S-I:1152, 1793-94. These objections were available in a joint trial the same as they would have been in a separate one. There is no reason why, for instance, Tew could not have objected to the evidence on the ground that unfair prejudice substantially outweighed any relevance. Tew also does not argue that the evidence was admissible against Michael but not her. Hence it was not the joint nature of the trial that compromised any rights Tew might have as to this evidence—it was her own failure to object.

Plus, any prejudice was cured by an instruction telling the jury its verdict as to one defendant "should not influence" its verdict as to the other. II:895. This sort of limiting instruction "often will suffice to cure any prejudice," *Zafiro*, 506 U.S. at 539—and did here.

Kimberley next highlights statements by Michael's counsel describing her as abusive, manipulative, and the like. Op. Br. 38. While it is true that Michael's counsel would not have been able to make these statements in a separate trial, any prejudice was mitigated not only by the limiting instruction just mentioned, but also the district court's additional and repeated warnings that counsel's statements were not evidence. S-I:155, 725, 1721, 1790. This court presumes the jury heeded these warnings and Tew provides no reason to think otherwise. *Jones*, 530 F.3d at 1303.

If Kimberley thinks the antagonism itself established prejudice, Op. Br. 38, this court has held otherwise. It was "not persuaded" by a defendant's argument that "prejudice must be presumed" on account of mutually-exclusive defenses. *Pursley*, 474 F.3d at 766.

Tew responds with a trio of out-of-circuit cases ordering severance. But each case distinguishes itself. The first two are distinguishable because a joint trial resulted in the admission of prejudicial evidence that would not have been admissible in a separate trial, which was not the case here.

In *United States v. Breinig*, 70 F.3d 850, 851 (6th Cir. 1995), a former wife advanced a diminished-capacity defense that triggered the admission of highly inflammatory evidence about her co-defendant ex-husband's bad character "that would not have been admissible" in a separate trial of the ex-husband.

In *United States v. Blunt*, 930 F.3d 119, 127 (3d Cir. 2019), a wife was tried with her husband and was put to the choice "of testifying adversely against her spouse in her own defense or exercising her privilege against adverse spousal testimony." The wife chose to testify, which resulted in the admission of prejudicial evidence against the husband that "would not have been admitted" if he had been tried alone such that the wife "had been able to exercise her spousal privilege." *Id.* at 126.

The third case, *United States v. Green*, 114 F.4th 163, 179 (3d Cir. 2024), involved defenses that really were mutually exclusive. Green argued there was no kidnapping while Murphy argued that Green coerced him into the kidnapping. Here, to reiterate, Michael never admitted to committing fraud. Besides, there was evidence

"used to inculpate Green that was admissible only through Murphy," who testified in his own defense. *Id.* at 177.

*3. Any prejudice was outweighed by concerns over economy and expedition.*

If any prejudice remained after the district court's limiting instructions, it was far outweighed by considerations of economy and expedition that weighed especially heavy here.

The district court's observations on this point in denying Michael's motion apply with equal force here. Numerous witnesses, "most of whom flew from out of state," had already testified. II:792. The case had been "ongoing for nearly four years, largely due to delays requested by" the Tews. II:792. And both Tews "tried to delay" the trial "multiple times (both before and after it started), including through re-litigation of many issues resolved prior to trial." II:792.

Tew has no answer to these considerations. She does not even mention them. Having ignored one side of the balance altogether, she has not carried her burden to make "an affirmative showing of an abuse of discretion." *Jones*, 530 F.3d at 1300 (citation omitted).

For years, the district court had a front-row seat to the Tews' delay tactics and procedural machinations. Kimberley's midtrial

severance "motion" (if one can call it that) was the latest installment. The district court did not abuse its discretion.

## CONCLUSION

The court should affirm.

DATED: August 6, 2025

Respectfully submitted,

PETER MCNEILLY
United States Attorney

*/s/ Rajiv Mohan*
RAJIV MOHAN
Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. 32(a)(7)(B)(i), I certify that the **UNITED STATES' ANSWER BRIEF** is proportionally spaced and contains 11,151 words, according to the Microsoft Word software used in preparing the brief.

DATED: August 6, 2025

*/s/ Kayla Keiter*
KAYLA KEITER
U.S. Attorney's Office

## Certificate of Service

I certify that on August 6, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit, using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Kayla Keiter*
KAYLA KEITER
U.S. Attorney's Office